**STATE of Delaware, Plaintiff,**

v.

**Gary Alan READER et al., Defendants.**

Superior Court of Delaware,
New Castle County.

Oct. 22, 1974.

Joseph A. Hurley and Jeffrey M. Weiner, Deputy Attys. Gen., Wilmington, for the State of Delaware.

Robert F. Stewart, Jr., Morris, Nichols, Arsht & Tunnell, James F. Burnett, Potter, Anderson & Corroon and James S. Green, Connolly, Bove & Lodge, Wilmington, for defendants.

STIFTEL, President Judge.

Motion to suppress items seized from the home of defendants Deborah M. and Gary A. Reader during a drug raid. These items include approximately one ounce of marijuana and certain marijuana related paraphernalia. Defendants are charged with unlawful possession of marijuana. The facts are essentially as follows:

On February 28, 1973, Sergeant McGinty of the New Castle County Police received a telephone call from the manager of the Skyways Motel. The manager notified him of an unusual number of young people observed entering and exiting a room registered to one Michael Marinelli. Marinelli was known to Sergeant McGinty as a drug dealer. McGinty's information on Marinelli came from Sheriff Ernest Beck of Cecil County, Maryland, who, in turn, received his information from an informant. On the same day, Sergeant McGinty received a report from an informer that "Gary Reader deals a large portion of the drugs of one Michael Marinelli". The ba-

sis for this statement was not related by the informant. Reader was investigated by the New Castle County Police for drug involvement in 1971.

Sergeant McGinty checked the motel records and discovered twelve telephone calls made from Michael Marinelli's room to Gary Reader's residence. The records also revealed that two suspected drug traffickers from Arizona, named Peters and Allen, had been staying at the motel and had made three telephone calls to Mr. Reader's residence between February 20 and February 22, 1973.

On the basis of this information, surveillance of the Reader residence, for the purpose of observing drug related activities, was begun at 9:00 P.M. on February 28, 1973. The surveillance consisted of two officers in a van parked near the Reader residence and five or six other officers located at various points throughout the neighborhood. Sergeant McGinty was in charge of the operation and was located at the police substation at Sommerdale Road, maintaining contact with the officers.

Throughout the course of the surveillance, various activities occurred which aroused the suspicion of the officers. People were observed coming and going from the Reader residence, staying for short periods of time. Some of these individuals were observed entering the residence empty-handed and leaving carrying packages of some sort. Two individuals were observed entering the residence empty-handed and carrying suitcases on their departure. All of these individuals observed were described as "older teenagers or young adults". Moreover, occupants of the Reader residence came out and inspected the surveillance van by checking the doors and shining a flashlight inside it. One of the individuals who had departed the Reader residence drove through the neighborhood with the high beams of his vehicle's headlights turned on. To Sergeant McGinty, these latter two activities indicated paranoia of being watched, which was "indicative of

people involved in drug trafficking". Other members of the surveillance team believed they may have been detected by those inspecting the van and circling the neighborhood.

Sergeant McGinty consulted Deputy Attorney General Joseph Hurley for advice on the legality of raiding the Reader home. At midnight on February 28, 1973 (March 1, 1973), Sergeant McGinty authorized a raid of the premises for the purpose of securing the residence and any possible drugs inside and to allow time to obtain a search warrant. After knocking on the door, identifying themselves, and receiving no response other than a "rustling noise", the police forcibly entered the home. At that time, a small quantity of marijuana—approximately one ounce—was observed on the floor of the den in plain view. The occupants were confined to one area of the home. Sergeant McGinty then obtained a search warrant and returned with it at approximately 2:40 A.M. Upon searching the premises, no additional marijuana was found. However, the search revealed the presence of marijuana related paraphernalia, such as a water pipe and hash pipe, as well as a quantity of pills and a white powder substance. These items were also seized.

The defendants seek to suppress from evidence all the items seized from their home. They claim that the police had no probable cause to search the premises, with or without a warrant. They further argue that if probable cause did exist, the initial warrantless intrusion was illegal since the police were not faced with an emergency situation. I shall discuss these arguments seriatim.

### Probable Cause

█ Insofar as the marijuana seized from the Reader home was discovered upon the initial warrantless entry therein, it is the constitutional propriety of the warrantless intrusion which must be determined. Therefore, probable cause must be based on facts known and observed prior to entry. A search cannot be justified by what is observed after entry. Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948).

Probable cause is an elusive concept, incapable of being precisely defined. It is a practical concept affording the best compromise that has been found for accommodating the often opposing interests of privacy and law enforcement.

█ In order to ascertain whether probable cause exists, "The sum total of [all] layers of information and the synthesis of what the police have heard, what they know, and what they observe as trained officers" must be considered. People v. Tolentino, 40 A.D.2d 596, 335 N.Y.S.2d 958, 960 (1972); Accord: Marvel v. State, 200 A.2d 641 (Del.Supr.1967); Rossitto v. State, 234 A.2d 438 (Del.Supr.1967). An analysis of each of the factors allegedly comprising probable cause individually is inadequate. Likewise, an analysis of those factors viewed through the eyes of a legal technician or an ordinary citizen is deficient. In appraising the factual situation, the Court must be cognizant of the fact that a police officer is not a constitutional lawyer. When assessing the quality of a policeman's actions, his specialized experience and work-a-day knowledge must be taken into account. State v. Williams, 117 N.J.Super. 372, 285 A.2d 23 (1971); State v. York, 282 A.2d 759 (N.J.Super.1971).

█ Upon scrutiny of the facts in this case, in light of the legal premises upon which probable cause must be based, the Court holds that probable cause to believe drug related activity was occurring in the Reader home did exist prior to the police entry therein. No one item in the State's evidence, considered in isolation, would have been sufficient to justify a reasonable man in believing that drug trafficking was taking place in the Reader home. Nevertheless, the totality of the evidence to an experienced narcotics investigator, such as Sergeant McGinty, familiar with the oper-

ative patterns of drug traffickers, did establish probable cause to believe drug related activity was occurring within the residence. The succession of superficially innocent events had proceeded to the point where a reasonably prudent police officer could conclude that "an innocent course of conduct was substantially less likely than a criminal one". United States v. Patterson, 492 F.2d 995, 997 (9 Cir., 1974). All of the following facts:

(1) The reputations of Reader and Marinelli;

(2) The phone calls from a motel room by Marinelli to Reader;

(3) The unusual activity in Marinelli's motel room;

(4) The informant's tip concerning Reader's drug association with Marinelli;

(5) The telephone contact between the two suspected drug traffickers from Arizona and Reader;

(6) The unusual number of visitors to the Reader home on February 28, 1973, after 9:00 P.M.;

(7) The short stay of those visitors;

(8) The fact that many of those visitors entered empty-handed and exited with packages;

(9) The suspicious activities of certain occupants of the house vis-a-vis their inspection of the police van;

logically led the police to conclude that "there were far too many interrelated factors to have been the result of pure coincidence", United States v. Lampkin, 464 F.2d 1093, 1096 (3 Cir., 1972), and that criminal activity was afoot. As stated by Chief Judge Friendly of the Second Circuit Court of Appeals,

"The trier is entitled, in fact bound, to consider the evidence as a whole; and, in law as in life, the effect of this generally is much greater than the sum of the parts."

United States v. Manning, 448 F.2d 992, 999 (2 Cir., 1971); *Accord:* Marvel v. State, *supra;* Rossiter v. State, *supra.*

Therefore, the Court holds that the police had probable cause to search the Reader home and the items seized during the search pursuant to a warrant will not be suppressed.

### Exigent Circumstances

■ To be valid under the Fourth Amendment, as applicable to States through the Fourteenth Amendment, a warrantless search must fall within one of the well-recognized exceptions to the warrant requirement. Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 24 L. Ed.2d 564 (1971). One of these exceptions is the doctrine of exigent circumstances. Patrick v. State, 227 A.2d 486 (Del.Supr., 1967).

■ Under the doctrine of exigent circumstances, a warrantless entry into a residence is permissible where the police are threatened with imminent destruction or removal of evidence. Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1968); United States v. Jeffers, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951); United States v. Rubin, 474 F.2d 262 (3 Cir., 1973); United States v. Davis, 461 F.2d 1026 (3 Cir., 1972). When the evidence is narcotics, speed is essential. Kaplan, "Search and Seizure: A No-Man's Land in the Criminal Law", 49 Calif.L.Rev. 474, 480. Narcotics are readily removable and destructible. United States v. Davis, *supra;* United States v. Rubin, *supra.* However, the burden is on the State to demonstrate the existence of exigent circumstances, i. e., the threatened or imminent removal or destruction of evidence. United States v. Jeffers, *supra;* McDonald v. United States, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948); Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1968). In the opinion of this Court, the State has met its burden.

▮ The police commenced surveillance of the Reader home at 9:00 P.M. During the period from 9:00 P.M. to midnight events transpired quickly. The police observed the following activity:

(a) Approximately 12 people entered the Reader house, alone or in groups;

(b) The visitors stayed for short periods of time—5 to 10 minutes;

(c) Many of the individuals who entered the house empty-handed exited carrying packages; two individuals carried suitcases when departing;

(d) Occupants of the house came out and inspected the police surveillance van by shining flashlights into the windows and trying to open the doors;

(e) One of the individuals leaving the Reader house drove through the neighborhood with the high beams of his vehicle on, immediately after a young male adult passed one of the surveillance vehicles.

Upon observing the latter two events, members of the surveillance team believed they had been detected. Considering that these officers, experienced in the detection of drug related activity, were in the midst of a situation where numerous events transpired within a short period of time, this belief was reasonable. Cognizant of facts "indicating the possessors of contraband [were] aware that the police [were] on their trail," the police could reasonably conclude that the contraband, believed to be in the house, might soon be removed or destroyed. See United States v. Doyle, 456 F.2d 1246 (5 Cir., 1972); United States v. Rubin, *supra*. The acquisition of a warrant was not feasible. The surveillance occurred between 9:00 P.M. and midnight. During the late evening hours, the acquisition of a warrant is necessarily subject to a lengthier delay than acquisition during business hours. In fact, after the police secured the house, it took Sergeant McGinty nearly three hours to obtain and return with a warrant. An affidavit for a warrant could not have been prepared prior to the surveillance. The activity observed during the surveillance was essential to a determination of probable cause.

The likelihood that police surveillance had been detected; the time factor in obtaining a warrant; and the ready destructibility of the contraband are all considerations of import when exigency is at issue. United States v. Rubin, *supra*. In the case at bar:

(1) The police reasonably believed they had been detected;

(2) The acquisition of a warrant would have entailed a lengthy delay;

(3) Contraband is readily destructible.

Hence, the police reasonably concluded that the threat of destruction of contraband necessitated action without prior judicial evaluation. The warrantless entry into the Reader home to prevent the removal or destruction of evidence pending the acquisition of a warrant was not violative of the Fourth Amendment and was proper under the facts and circumstances of this case.

Motion to suppress denied.

So ordered.