Richard MASON, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

Supreme Court of Delaware.

Submitted: Oct. 20, 1987.
Decided: Nov. 23, 1987.
As Corrected: Nov. 24, 1987.
Rehearing Denied Dec. 22, 1987.

Bernard J. O'Donnell, Asst. Public Defender, Wilmington, for appellant.

Timothy J. Donovan, Jr., Deputy Atty. Gen., Wilmington, for appellee.

Before CHRISTIE, C.J., WALSH and HOLLAND, JJ.

HOLLAND, Justice.

The appellant, Richard T. Mason, was convicted in the Superior Court in and for New Castle County of Trafficking in Cocaine and of Possession with Intent to Deliver Marijuana. The Superior Court sentenced Mason to the mandatory minimum aggregate period of six years imprisonment followed by a substantial period of probation. The issue on appeal is whether the Superior Court erred in not granting a motion to suppress the evidence obtained by the police during a search of Mason's apartment.

The underlying issues are whether there were exigent circumstances to justify a warrantless nighttime entry into Mason's apartment and, if not, whether the subsequent nighttime search warrant was validly issued, and thereby removed the taint from the initial warrantless entry.[1] Based upon

---

1. A third issue raised by Mason relates to the fact that the search of his apartment began once the officers securing it had been advised by telephone that the warrant had been issued. Mason did not present this issue to the Superior Court. This Court will generally decline to re-

our examination of the record, we have concluded that the warrantless entry into Mason's apartment was not justified under the circumstances. We have also concluded that the search warrant which was subsequently issued failed to meet the statutory requirements for a nighttime search of a residence. Therefore, we reverse the decision of the Superior Court denying Mason's motion to suppress the evidence which was seized. Accordingly, we also reverse Mason's convictions.

### Facts

The arrest of Mason and the nighttime search of Mason's residence on August 29, 1985 occurred after a three-week investigation by the police. On August 6, 1985, an informant indicated to Detective John Eller of the Newark Police Department that an individual named Dan Barnett had sold him marijuana and cocaine on several occasions. Detective Eller, working undercover, with the assistance of the informant, was able to arrange for the purchase of half a gram of cocaine from Barnett. On August 8, 1985, Detective Eller was told that Barnett would leave the Acme Market in the Pike Creek Shopping Center on his lunch break to get the cocaine and then deliver it to Detective Eller later that evening. Detective Eller secretly followed Barnett from the Acme Market to Building 43L of the Garden Quarter Apartments and then back to his job at the Acme Market. Detective Eller then called the informant who told him that Barnett had purchased the cocaine and would deliver it as planned. Later that night at 10:30 p.m., Detective Eller met Barnett at a prearranged location and bought a half a gram of cocaine from him for $55.00.

Detective Eller was able to elicit from Barnett that Barnett's drug supplier was a Jamaican, named Rick, who lived in Apartment 2B of his apartment complex. Barnett told Eller that he had dealt with Rick many times in the past and knew that Rick dealt in large quantities of marijuana and cocaine, which he received from a Philadelphia supplier.

The police decided to investigate Barnett's information about "Rick." On August 27, 1985, Delaware State Police Detective William Bullen called the local electric company and was told that charges to Apartment 2B of Building 43L were billed to a Jody Amato. Detective Eller also called the manager of the Garden Quarter Apartments. He was informed by the manager that Apartment 2B was leased to a Jody Amato and that she lived with her husband, Richard Mason, and their children. Detective Bullen later walked through the apartment building and saw black children and an older black male come from Apartment 2B. Detective Bullen also smelled what he believed to be marijuana coming from the apartment.[2]

In an effort to further pursue the suspicions about drug dealing by Mason, Detective Eller arranged to purchase an ounce of cocaine from Barnett for $2,100.00.[3] On August 29, 1985 at about 10:00 p.m., Detective Eller and another undercover police officer met Barnett in the parking lot of the Pike Creek Shopping Center, where

---

view the contentions that are not raised and fairly presented to the trial court for decision unless the error complained of was so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process. Supr.Ct.R. 8; *Wainwright v. State,* Del.Supr., 504 A.2d 1096, 1100 (1986). However, we find it unnecessary to reach and analyze this issue because of our disposition of Mason's other arguments.

**2.** Detective Bullen later checked with the Drug Enforcement Agency (DEA) and found that it had received information in the past that Mason was dealing in drugs and that Mason was listed in the DEA's computer as a suspected drug dealer.

**3.** Barnett was originally to sell to Detective Eller the ounce of cocaine on August 28, 1985. Barnett said he would get the drugs after he had the money. Thereafter, Barnett was observed going to the Mason's apartment building to see if the cocaine was there. Later that night, Detective Eller spoke to Barnett by telephone. Barnett stated that his supplier had only a half ounce of cocaine. Detective Eller declined to buy the half ounce. Approximately two minutes after the telephone call, Barnett was seen leaving Mason's apartment building and then returning to his building.

Barnett worked. Barnett stated that the supplier was not in at that time, but would be back soon. After a short wait, Barnett made a phone call and stated that everything was set. Detective Eller gave Barnett the money, and Barnett left. Detective Eller went to the parking lot of the Meadowood Shopping Center near the Garden Quarter Apartments, where the transfer of the cocaine was to take place.

Delaware State Police Detective Gary Gray followed Barnett from the Pike Creek Shopping Center to the Garden Quarter Apartments. There, Detective Bullen was already positioned to continue the surveillance. Detective Bullen testified that just prior to Barnett's arrival, a Cadillac with Pennsylvania license plates arrived at the complex. The occupant, an unknown black male, entered Building 43L.[4] Barnett then arrived, at about 11:00 p.m., and he too entered Building 43L where Mason lived in Apartment 2B. Detective Bullen drove around the side of the complex and from the street could see Barnett in Mason's apartment. After several minutes, Barnett left the apartment and drove off. A few minutes later, Detective Bullen observed the unknown black male leave Building 43L and drive off in the same general direction as Barnett.

Barnett met Detective Eller, as arranged, at the Meadowood Shopping Center and gave him the ounce of cocaine. Barnett was immediately placed under arrest, apparently while still inside of a car. Detective Eller explained to Barnett that the officers knew that Barnett was the middleman, that they knew where Barnett was getting his drugs from, and that if he wanted to help he would take the officers back to where he got the cocaine and "get the officers inside the door." Barnett agreed and was taken back to the apartment complex in handcuffs.

At the apartment complex, Detectives Eller and Bullen discussed the "pros and cons" of an immediate nighttime warrant-

less entry into Mason's residence. Based upon their month-long investigation, the police had prepared an affidavit and application for a search warrant. From their perspective, the only information needed to complete the application were the facts of the recently completed drug purchase. Barnett had told the officers that Mason and his wife were alone in their residence. Barnett also did not mention seeing any other drugs in the Mason residence on this night. Nevertheless, Detectives Eller and Bullen feared that the unidentified black male driver of the Cadillac *may* have been Mason's Philadelphia drug connection, that he *may* have observed Barnett's arrest, and that *may* have informed Mason by telephone of what had happened.[5]

The decision was made to enter Mason's residence immediately without a warrant and to secure it until a search warrant could be obtained. According to the policemen's testimony, they walked Barnett, who was handcuffed and had agreed to cooperate, up to Mason's apartment at approximately 11:20 p.m. When Mason inquired who it was, Barnett identified himself. Mason opened the door. The police, with guns drawn, identified themselves. The police then secured the apartment, finding Mason, his wife, and two small children. The police placed these individuals on the sofa in the living room. Detective Eller checked beneath the sofa cushions for weapons. Each room of the apartment was checked to make sure no one else was present. However, no other search of the apartment was conducted at this time. Detectives Eller and Bullen then went to the Justice of the Peace Court No. 11 to secure the search warrant, while Detective Gray and Special Agent Boulden of the DEA remained behind in the apartment.

When Detectives Eller and Bullen arrived at Justice of the Peace Court No. 11, they completed the prepared search warrant application and affidavit. The search

---

4. Building 43L is comprised of twelve separate apartments.

5. Detective Bullen's fears regarding the driver of the Cadillac were based upon the fact that when

he radioed other police officers to try to follow the Cadillac, they "lost" the car when they tried to turn around to follow it.

warrant was then signed by the issuing Magistrate at about 12:20 a.m. on August 30, 1985. Detectives Eller and Bullen telephoned the officers at Mason's residence immediately after the Magistrate signed the warrant and instructed them to begin the search. That search produced the controlled substances which were the subject of the motion to suppress evidence in the Superior Court and which Mason now brings before this Court on appeal.

### The Search Warrant Requirement

The first issue in this case involves a warrantless nighttime entry into a residence. The present restrictions on such conduct are well known. However, a review of the circumstances which led to the current state of the law is instructive, especially in this year which commemorates the two hundredth anniversary of the United States Constitution.

The Framers of the United States Constitution were concerned with the problem of searches and seizures by public officials. The concept of the home as a privileged place, the privacy of which may not be disturbed by unreasonable governmental intrusion, is basic in a free society. The Framers were aware of the attempts that had been made by representatives of the King of England, both in England and in the American colonies, to exceed laws which confined governmental powers to search.

Fundamental limitations on the power of public officials to search, which remain viable today, had been established in the American colonies as early as 1765. *See Entick v. Carrington,* 19 Howell's State Trials 1029 (1765).[6] One of the most famous attacks on governmental authority to search was made by James Otis against general writs of assistance in *Paxton's Case,* Quincy's Rep. 51 (Mass.1761). Otis was concerned with what he described as "the freedom of one's house," which he further characterized as "one of the most essential branches of English liberty."[7] The United States Supreme Court has described the debate in *Paxton's Case* as "perhaps the most prominent event which inaugurated the resistence of the colonies to the oppressions of the mother country." *Boyd v. United States,* 116 U.S. 616, 625, 6 S.Ct. 524, 529, 29 L.Ed. 746 (1886). John Adams described the argument in *Paxton's Case* as one which "breathed into this nation the breath of life", and "then and there the child of independence was born." 10 *Works of John Adams* 248 (C.F. Adams ed. 1856).

When the federal Constitution was proposed in 1787, one of its most controversial features was the absence of a Bill of Rights which would secure personal liberties, including a guarantee against unreasonable searches and seizures.[8] The feder-

---

**6.** This is an extension of a principle of English liberty that "the house of every one is to him as his castle and fortress, as well for his defense against injury and violence, as for his repose." *Semayne's Case,* 5 Coke's Rep. 91a, 91b (1603).

**7.** *Frank v. Maryland,* 359 U.S. 360, 379, 79 S.Ct. 804, 815, 3 L.Ed.2d 877 (1959) (Douglas, J., dissenting) (quoting Tudor, *Life of James Otis* 66 (1823)). *See also* 1 B. Schwartz, *A Commentary on the Constitution of the United States* 178–79 (1968).

**8.** The movement to add a Bill of Rights to the federal Constitution began during the debates in September 1787 in Philadelphia. During those debates, George Mason, an Anti–Federalist (the popular name for those opposing the Constitution) wrote his *Objections to the Constitution. See* P.L. Ford, *Pamphlets on the Constitution of the United States* 327–32 (1888), *reprinted in* 1 B. Schwartz, *The Bill of Rights: A Documentary History* 444–47 (1971). Mason started his *Objec-*

*tions* by the assertion: "There is no declaration of rights," and "the declaration of rights, in the separate states, are no security" since federal laws are supreme. *Id.* at 327, *reprinted in* 1 B. Schwartz, *supra,* at 444.

The debate on the Constitution at the state ratifying convention and popular pressure for a Bill of Rights to be added to the document affected the Federalists. Massachusetts was the first state to officially propose amendments which it sent to Congress along with its ratification of the Constitution. Other states followed the Massachusetts approach.

In his first message to Congress, President George Washington referred to the widespread demand for amendments to the Constitution. 1 *Annals of Congress* 27–30 (Washington, D.C. 1834), *reprinted in* 2 B. Schwartz, *supra,* at 1009–12. On June 8, 1789, James Madison addressed the House of Representatives and introduced the legislation that was ultimately to become the federal Bill of Rights. 1 *The Debates*

al Bill of Rights, including the Fourth Amendment[9] to the United States Constitution, was adopted in 1791.[10] However, Delaware's protections against unreasonable searches and seizures predate those which are provided for in the Fourth Amendment. Delaware adopted a "bill of rights" as part of its own Constitution on September 11, 1776.[11] Section 17 of the Delaware Declaration of Rights and Fundamental Rules made specific limitations on the government's authority to search.[12] Those provisions in the Delaware Declaration were the antecedents to general provisions now found in Article I, Section 6 of the present Delaware Constitution.[13]

### The Warrantless Entry

The Fourth Amendment to the United States Constitution was obviously a reaction, in part, to the general warrants and warrantless searches that had alienated the colonists and helped the movement for independence gain impetus. *Chimel v. California*, 395 U.S. 752, 761, 89 S.Ct. 2034, 2039, 23 L.Ed.2d 685 (1969). In the scheme of the Fourth Amendment, the requirement that "no Warrants shall issue, but upon probable cause" plays a crucial role. *Id.* The United States Supreme Court has held:

> We are not dealing with formalities. The presence of a search warrant serves a high function. Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police. This was done not to shield criminals nor to make the home a safe haven for illegal activities. It was done so that an objective mind might weigh the need to invade that privacy in order to enforce the law. The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals. . . . And so the Constitution requires a magistrate to pass on the desires of the police before they violate the privacy of the home. We cannot be true to that constitutional requirement and excuse the absence of a search warrant without a showing by those who seek exemption from the constitutional mandate that the exigencies of the situation made that course imperative.

*McDonald v. United States*, 335 U.S. 451, 455–56, 69 S.Ct. 191, 193, 93 L.Ed. 153 (1948).

■ In *Payton v. New York*, the United States Supreme Court stated that it "is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980) (footnote omitted). It continued:

> In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Ab-

---

*and Proceedings of the Congress of the United States* 449–53 (Washington, D.C. 1834). It is interesting to note that John Vining of Delaware was the Chairman of the Committee Select which studied Madison's proposals. *See* 2 B. Schwartz, *supra,* at 1050.

**9.** The Fourth Amendment states:
The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
U.S. Const. amend. IV.

**10.** The amendment in the Bill of Rights concerning searches and seizure was framed and adopted with the fresh recollection of the debates on writs of assistance and the Revolution which followed. *Davis v. United States,* 328 U.S.

582, 605, 66 S.Ct. 1256, 1267, 90 L.Ed. 1453 (1946) (Frankfurter, J., dissenting).

**11.** The protection against unreasonable searches and seizures is so basic to the concept of liberty that every state now has a similar constitutional provision. *Digest of State Constitutions* 921 index (2d ed. 1959).

**12.** 1 *Del. Laws* app. at 81 (1797).

**13.** Section 6 provides as follows:
The people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures; and no warrant to search any place, or to seize any person or thing, shall issue without describing them as particularly as may be; nor then, unless there be probable cause supported by oath or affirmation.
Del. Const. art. I, § 6.

sent exigent circumstances, that threshhold may not reasonably be crossed without a warrant.

*Id.* at 590, 100 S.Ct. at 1382.[14]

■ However, these cases illustrate that, even historically, the right to be secure in one's home as provided for in the United States and Delaware Constitutions was not an absolute right. The expressed terms of the State and federal Constitutions provide that right is to be secure against "unreasonable searches and seizures." Nonetheless, the history of the constitutional provisions limiting searches and seizures leaves little doubt that searches and seizures are presumptively "unreasonable" unless they are authorized by warrants, issued upon probable cause, and supported by oath or affirmation before a neutral judicial officer, subject to a few exceptions justified by absolute necessity. *See Coolidge v. New Hampshire,* 403 U.S. 443, 449–84, 91 S.Ct. 2022, 2029–47, 29 L.Ed.2d 564 (1971). One of the recognized exceptions to the search warrant requirement is the doctrine of exigent circumstances. *Patrick v. State,* Del.Supr., 227 A.2d 486, 489 (1967).

■ The State argues in this case that the warrantless entry into Mason's apartment was reasonable due to exigent circumstances. The burden is on the State to demonstrate the existence of those exigent circumstances. *See Welsh v. Wisconsin,* 466 U.S. 740, 749–50, 104 S.Ct. 2091, 2097, 80 L.Ed.2d 732 (1984). Moreover, the burden upon the State to demonstrate the existence of exigent circumstances which would justify a *warrantless nighttime search* of a residence has deliberately been

set at a high level by the Delaware legislature.

Delaware's independent interest in protecting its citizens against unreasonable searches and seizures did not diminish after the adoption of the Fourth Amendment to the federal Constitution. For more than one hundred years, the Delaware legislature has specifically required, by statute, the existence of exigent circumstances to search and seize evidence in a residence during the nighttime *with a warrant.*[15] Section 2308 currently provides:

A search warrant shall not authorize the person executing it to search any dwelling house in the nighttime unless the judge, justice of the peace or magistrate is satisfied that it is necessary in order to prevent the escape or removal of the person or thing to be searched for, and then the authority shall be expressly given in the warrant. For purposes of this section the term "nighttime" shall mean the period of time between 10:00 p.m. and 6:00 a.m.

11 *Del.C.* § 2308. *See also* 63 *Del. Laws,* ch. 308, § 1.

■ This stringent requirement even for a nighttime search of a dwelling *with a warrant* is not unique to Delaware. Many other states have similar statutes. *See Henry v. State,* Del.Supr., 373 A.2d 575, 577 n.2 (1977). Therefore, to justify a warrantless nighttime search of a residence under the Delaware statute it is not enough for the State to demonstrate that there was a need "to prevent the escape or removal of the person or thing to be search for." The burden upon the State under these circumstances is to demonstrate that the person would escape or that the evi-

---

**14.** Delaware law is consistent with *Payton v. New York. See* Del. Const. art. I, § 6; 11 *Del.C.* §§ 2301, 2308; *Patrick v. State,* Del. Supr., 227 A.2d 486, 489 (1967); *Freeman v. State,* Del. Supr., 317 A.2d 540, 541–42 (1974). In Delaware, absent exigent circumstances, the police must obtain a search warrant before entering a home at anytime—day or night. *See* 11 *Del.C.* § 2301.

**15.** Early Delaware law provided:

A search warrant shall not authorize the person executing it to search any dwelling-

house in the night time, unless the magistrate, or justice, shall be satisfied that it is necessary in order to prevent the escape, or removal, of the person, or things, to be searched for; and then the authority shall be expressly given in the warrant.

*Del.Rev.Stat.,* ch. 97, § 29 (1852). *See also* 11 *Del.C.* § 2308 (1979 & Cum.Supp.1986) and its antecedents, *e.g.,* 11 *Del.C.* § 2308 (1953); *Del. Rev.C.,* ch. 119, § 38 (1935); *Del.Rev.Stat.,* ch. 97, § 29 (1893).

dence would be removed or destroyed during the night *before* a search warrant could be secured. *Freeman v. State*, Del.Supr., 317 A.2d 540, 541–42 (1974); *Williams v. State*, Del.Supr., 331 A.2d 380, 382–83 (1975); *United States v. Rubin*, 474 F.2d 262, 268–69 (3d Cir.), *cert. denied sub nom. Agran v. United States*, 414 U.S. 833, 94 S.Ct. 173, 38 L.Ed.2d 68 (1973).

■ In this case, the State argues that the warrantless nighttime entry into Mason's home was reasonable. The reasonableness of a warrantless entry into a residence by the police in Delaware "is measured by the circumstances then existing." *Patrick v. State*, 227 A.2d at 489. "As a general rule, ... an emergency may be said to exist, within the meaning of the [nighttime] 'exigency' rule, whenever the police have credible information that an unnatural death has, or may have, occurred." *Id.* Additionally, the Delaware Superior Court has recognized that the police may enter a residence without a warrant during the nighttime where the police are faced with the "imminent destruction or removal of evidence." *State v. Reader*, Del.Super., 328 A.2d 146, 149 (1974).

■ "Reasonableness is a flexible concept which must be considered with regard to the totality of the circumstances and with particular regard to the balancing of the needs of effective and reasonable law enforcement with the rights of privacy of the individual." *Williams v. State*, 331 A.2d at 382. However, the burden is upon the State to demonstrate reasonableness by establishing the existence of circumstances which make it impracticable to secure a warrant to search during the nighttime. *See Freeman v. State*, 317 A.2d at 541–42.

The circumstances of this case must be measured by these standards. Here, the

police had Mason's residence under surveillance for almost three weeks. During that time, the police suspected not only that Mason had been selling drugs from his residence, but also that they had previously purchased cocaine from Mason through Barnett. Moreover, on another occasion, the police had smelled what they thought was marijuana coming from Mason's residence. Nevertheless, no attempt was made to arrest Mason or to obtain a warrant to search Mason's residence until the night of Barnett's arrest.

The record shows that the police decided to enter Mason's apartment during the night without a search warrant almost immediately after they arrested Barnett, some distance away from Mason's residence.[16] Detective Eller testified:

A. I told him, I said Dan, we know where you got the cocaine from and why don't you go back there and get us in the door, and he said kill me and all this stuff. I said the choice is yours. And of course he chose to go ahead and do so.

Detective Ryser and I took him back to Mason's apartment in handcuffs, walked him up to the door of Mason's apartment, and we knocked on the door for him. And in the meantime, other things transpired. At this point, we had the radios on and we were aware of some other things.[17]

The primary "other thing"[18] which the police now argue justified their warrantless nighttime entry into Mason's home was their inability to follow the unknown black male driving a Cadillac with a Pennsylvania license plate. This argument is not persuasive. The police testified that they were able to observe Barnett within Mason's apartment. However, there is no testimony that the unidentified black male

**16.** *Cf. Vale v. Louisiana*, 399 U.S. 30, 31–35, 90 S.Ct. 1969, 1970–72, 26 L.Ed.2d 409 (1970).

**17.** Appendix to Appellant's Opening Brief at A–28, *Mason v. State*, Del. Supr., No. 387, 1986.

**18.** The police also testified that they feared Barnett's arrest had prevented him from completing a prearranged "call back" to Mason to verify

that the drug sale went smoothly. However, the police never asked Barnett if he and Mason did in fact have a "call back" agreement. Since Barnett was cooperating with the police, there is no reason to believe that he would not have agreed to call Mason and tell him that the sale had been completed if there had been such an understanding between Barnett and Mason.

was ever seen in Mason's apartment. Mason lived in a building that included twelve separate apartments. There is no evidence to connect the unidentified black male with Mason's apartment anymore than with any other apartment. In fact, Barnett told the police that only Mason and Mason's wife were present in their residence when he was there that evening.

This Court, like the trial court, finds that the police were sincere in their suspicions about the unidentified black male. However, it takes more than suspicion to create an emergency situation which justifies a warrantless nighttime entry into a residence. *Williams v. State,* 331 A.2d at 382–83. Policemen cannot create their own exigent circumstances. *United States v. Segura,* 663 F.2d 411, 415 (2d Cir.1981), *aff'd,* 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984). "To justify a warrantless entry based on imminent destruction of evidence, *factual* circumstances must demonstrate a sufficient basis for an officer to believe somebody in the residence will likely destroy evidence." *United States v. Beck,* 662 F.2d 527, 530 (8th Cir.1981) (emphasis added).

The suspicion of the officers in this case was an insufficient basis for the warrantless entry. "Mere fear or apprehension alone that evidence will be destroyed will not justify a warrantless entry of a private home." *United States v. Perez,* 700 F.2d 1232, 1237 (8th Cir.1983), *cert. denied,* 468 U.S. 1217, 104 S.Ct. 3587, 82 L.Ed.2d 884 (1984). Moreover, the suspicions of the police in this case that the unidentified black male was Mason's drug supplier are not supported in the record. Therefore, the fact is that the police had no more reason to believe that Mason would flee his residence following Barnett's arrest than they had during the course of their prior surveillance of Mason's residence for almost one month.

There is also no indication in the record that there was *any evidence* in Mason's apartment that *could* be removed or destroyed. Barnett was arrested at approximately 11:20 p.m. Not only did he advise

the police that Mason and his wife were alone in the apartment, but Barnett did *not* tell the police that there were any other drugs in the apartment.

Detective Eller testified:

A. We didn't know how many other drugs were in the apartment. I don't remember having a discussion with Barnett about what other drugs were in the apartment.

Q. Did you know whether any other drugs were in the apartment?

A. No. For a fact, I did not.[19]

Despite the fact that the police had previously prepared an application for a warrant to search Mason's residence, that plan was abandoned immediately after Barnett's arrest. The United States Supreme Court has held that the unexplained failure of agents to procure a search warrant, when they had enough time to do so, rendered a search unlawful. *Trupiano v. United States,* 334 U.S. 699, 705–10, 68 S.Ct. 1229, 1232–34, 92 L.Ed. 1663 (1948). In particular, the Court stated:

It is a cardinal rule that, in seizing goods and articles, law enforcement agents must secure and use search warrants wherever reasonably practicable. This rule rests upon the desirability of having magistrates rather than police officers determine when searches and seizures are permissible and what limitations should be placed upon such activities. ... To provide the necessary security against unreasonable intrusions upon the private lives of individuals, the framers of the Fourth Amendment required adherence to judicial processes wherever possible. And subsequent history has confirmed the wisdom of that requirement.

*Id.* at 705, 68 S.Ct. at 1232 (citations omitted). In the present case, the totality of the circumstances were insufficient to justify a warrantless nighttime entry into Mason's residence. Therefore, in the absence of any exigent circumstances justifying the warrantless nighttime entry into Mason's

---

**19.** Appendix to Appellant's Opening Brief at A–51.

residence, we conclude that such entry was illegal.

### The Subsequently Issued Search Warrant

The State anticipated that the warrantless nighttime entry into Mason's residence would not withstand judicial scrutiny. Thus, the State argues in the alternative in this appeal that the evidence seized from Mason's home pursuant to a search warrant issued following the illegal entry need not be suppressed according to *Segura v. United States,* 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984).

In *Segura,* the United States Supreme Court framed the issue as "whether, because of an earlier illegal entry, the Fourth Amendment requires suppression of evidence seized later from a private residence pursuant to a valid search warrant which was issued on information obtained by the police before the entry into the residence." *Id.* at 797–98. The Court held:

> Whether the initial entry was illegal or not is irrelevant to the admissibility of the challenged evidence because there was an independent source for the warrant under which that evidence was seized. Exclusion of evidence as derivative or "fruit of the poisonous tree" is not warranted here because of that independent source.

*Id.* at 813–14. The Court viewed this position as consistent with its earlier decisions on the exclusionary rule because *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920), and other cases allowed the admission of evidence, regardless of a prior illegality on the part of the authorities, "when the link between the illegality and that evidence was sufficiently attenuated to dissipate the taint." *Segura v. United States,* 468 U.S. at 815, 104 S.Ct. at 3391. The Court pointed out that "evidence will not be excluded as 'fruit' unless the illegality is at least the 'but for' cause of the discovery of the evidence." *Id.* The Court concluded that the

"illegal entry into [Segura's] apartment did not contribute in any way to discovery of the evidence seized under the warrant; ... therefore, ... not even the threshold 'but for' requirement was met in this case." *Id.*

The holding in *Segura* was premised upon the specific finding by the Supreme Court that the subsequent search of the residence was independent of the original entry *and* pursuant to a *valid* search warrant. *Id.* at 813–14, 104 S.Ct. at 3389–90. Therefore, before an application of *Segura* can be considered, we must address the threshold question of the validity under Delaware law of the nighttime warrant for the search of Mason's residence, which warrant was issued subsequent to the initial entry and seizure of the residence by the police.

 No one disputes the fact that the police had probable cause to obtain a warrant to search Mason's home during the daytime. However, the Delaware statute with respect to the requirements for the issuance of a warrant to search a residence during the *nighttime* is clear and unambiguous and requires more than probable cause.[20] It requires a determination that such action is necessary "to prevent the escape or removal of the person or thing to be searched for." 11 *Del.C.* § 2308. Mason argues that the search warrant was improperly issued because the application for the warrant did not demonstrate that it was "necessary to prevent the escape or removal of the person or thing to be search for" and that, therefore, the requirements of 11 *Del. C.* § 2308 were not met.

 In this case, the application for the search warrant had been prepared almost entirely in advance. The prepared portions of the affidavit recited the events of the three weeks which preceded the cocaine purchase from Barnett on August 29, 1985. After the purchase from Barnett the following three paragraphs were added to the affidavit.

11. On 29 Aug 85 Det Eller purcharchedan [sic] ounce of cocaine from Bar-

20. *Cf. Jones v. United States,* 357 U.S. 493, 496–500, 78 S.Ct. 1253, 1255–57, 2 L.Ed.2d 1514 (1958).

newtt [sic] for $2100.00 and via surveillence it was determined that Barnett went into Masons apartment to get the cocaine. Det Bullen observed same. Det Eller purchased the cocaine at 2320–2330.

12. Aftr [sic] being read and advised of his rights Barnett after being arrested for trafficking in cocaine related thathe [sic] paid the $2100.00 to Mason and there was only Mason and his girl-friend in the apartment at the time.

13. Due tothe [sic] nature of the deal it is necessassary [sic] for the issuance of a nighttime time [sic] search warrant to preserve any evidence that may be destroyed.[21]

This Court has held that the sufficiency of an affidavit supporting a nighttime search warrant must be tested by considering the affidavit as a whole.

> [T]he "four-corners" test is ... applicable to the determination of whether a warrant may authorize a search at nighttime under § 2308. In other words, sufficient facts showing that a nighttime search is necessary to prevent the escape or removal of the person or thing to be searched for must appear on the *face of the affidavit* before such a search may be authorized. Only in this way can a reviewing court verify existence of the statutory requirements.

*Henry v. State*, Del.Supr., 373 A.2d 575, 577 (1977) (emphasis added). Nothing in the affidavit in this case comports with the statutory requirements that there be a demonstration that the nighttime search is necessary "to prevent the escape or remov-

al of the person or thing to be searched for." 11 *Del.C.* § 2308. *See Henry v. State*, 373 A.2d at 577–578. *Compare Jensen v. State*, Del.Supr., 482 A.2d 105, 112–13 (1984) *and Dunfee v. State*, Del.Supr., 346 A.2d 173, 175–76 (1975).

On the contrary, the affidavit recites a series of contacts with the Mason residence over several weeks. There is nothing in the affidavit to support the conclusion that Mason was going to flee from his residence immediately during the nighttime or destroy any evidence. There was no indication in the affidavit that the "nature of the deal" on August 29, 1985, was any different from the nature of the deals with Barnett from Mason's residence during the previous three weeks. Moreover, the only "evidence" which the police actually knew was in Mason's home was the $2,100.00 in "marked" money [22] which he was unlikely to want to destroy.[23] In *Alderton v. State*, the court was confronted with similar circumstances and held that there were no exigent circumstances which justified a warrantless entry into defendant's home for the purpose of detaining him while securing a search warrant in order to prevent his departure or destruction of marked money allegedly used to purchase illegal drugs. 438 So.2d 1000 (Fla.Dist.Ct.App. 1983).

■■■ However, not only did the application for the nighttime search warrant fail to satisfy the specific initial statutory requirements of Section 2308, but also the search warrant itself did not meet other statutory requirements. The final language of 11 *Del.C.* § 2308 prohibits a judi-

---

**21.** Appendix to Appellant's Opening Brief at A–14.

**22.** Actually, the money had been photocopied prior to the drug purchase by the police for future identification and not "marked" in any way.

**23.** *See Alderton v. State*, 438 So.2d 1000, 1001–02 (Fla.Dist.Ct.App.1983). The Court stated:

> The state would ask this court to surmise that it was necessary for the officers to enter the appellants' home and detain them while securing a search warrant in order to prevent their departure or the destruction of the marked money. The departure of the occu-

pants of the house could have been prevented by leaving one or more officers to watch the residence while the warrant was obtained. Given the officers' reason to believe that the occupants had sold marijuana to Angle, anyone departing the house could have been arrested without a warrant. If this action had become necessary, there might then have been sufficient exigent circumstances for the police to enter the house before the remaining occupants were alerted to the arrest, but that did not occur here. As to the marked money, the police had no reason to believe it was in the process of being destroyed or removed from the jurisdiction.

*Id.* (citation omitted).

cial officer from issuing a warrant for a nighttime search of a residence unless he is satisfied that it is "necessary to prevent the escape or removal of the person or thing to be searched for" and the authority shall be expressly given in the warrant. *Henry v. State*, 373 A.2d at 577. In fact, the form of the search warrant to be issued when a nighttime search for a dwelling has been authorized is prescribed *by statute.* 11 *Del.C.* § 2310(c). That statute provides in pertinent part as follows:

GREETINGS:

Upon the annexed affidavit and application or complaint for a search warrant, as I am satisfied that there is probable cause to believe that certain property, namely (describe the property) used or intended to be used for ......... is being concealed on the (premises) (person) described in the annexed affidavit and application or complaint; and that *search of the premises in the nighttime is necessary in order to prevent the escape or removal of the person or thing to be searched for;*

NOW THEREFORE, YOU ARE HEREBY COMMANDED *within 3 days* of the date hereof to search the above-named person, persons, house, place or conveyance for the property specified in the annexed affidavit and application, and to search any occupant or occupants found in the house....

*Id.* (emphasis added).

The form of warrant required by statute for the nighttime search of a residence was not used in this case. In fact, the form of search warrant which was issued appears to more closely follow the "form of search warrant where search of a dwelling house in the nighttime is *not* authorized."[24] The

search warrant in this case provided in pertinent part as follows:

TO LAW ENFORCEMENT OFFICER(S): WHEREAS, facts have been sworn to or affirmed before me, by written affidavit(s) attached hereto, from which I have found probable cause, I do authorize you to search the herein described premises and/or place(s) and/or vehicle(s) and/or person(s), and to seize, secure, inventory and make return according to the Delaware Code, the herein described items.

( ) This Warrant should be served no later than 10 ( ) A.M. (X) P.M. 9 Sept, 1985 and shall be served anytime during day or night

Issued under my hand this 30th day of Aug., 1985, at 12:20 A.M. o'clock. ...

(SEAL) [25]

The statutory directive for a specific finding of *necessity* for a nighttime search of a residence, by a neutral magistrate, was not satisfied in this case.

Superior Court Criminal Rule 41(c) provides that the "issuance and contents of a search warrant shall be as provided by statute." Subsection (e) of that same Rule provides for the suppression "for use as evidence anything obtained as a result of an unlawful search and seizure...." The search warrant in this case was not issued in accordance with the requirements of the applicable Delaware statutory law.

First, the Delaware legislature has set out a specific form for both the "Affidavit and Application for Search." 11 *Del.C.* § 2310(a). The affidavit here failed to allege with particularity facts indicating the existence of exigent circumstances justifying the issuance of a nighttime search warrant even though the need for those re-

---

**24.** 11 *Del.C.* § 2310(b) (emphasis added). That statute provides in pertinent part as follows:
GREETINGS:
Upon the annexed affidavit and application or complaint for a search warrant, as I am satisfied that there is probable cause to believe that certain property, namely (describe the property) used or intended to be used for ........................................- .........., is being concealed on the (premises) (person) described in the annexed affidavit and application or complaint;

NOW THEREFORE, YOU ARE HEREBY COMMANDED *within 10 days* of the date hereof to search the above-named person, persons, house, conveyance or place for the property specified in the annexed affidavit and application, and to search any occupant or occupants found in the house....
*Id.* (emphasis added).

**25.** Appendix to Appellant's Opening Brief at A-12.

quirements appear conspicuously on the preprinted form that was used.[26] Second, and most importantly, the statutory form for a nighttime "Search Warrant," 11 *Del. C.* § 2310(c), was not used. Section 2310(c) which requires an impartial magistrate to make a *specific finding that a nighttime search was necessary* "to prevent the escape or removal of the person or thing to be searched for." Finally, contrary to the statutory directive of Sections 2308 and 2310(c), the form of warrant used by the magistrate authorized the execution of the search warrant within the next *ten* days. This time limit far exceeds the *three* day limit that the Delaware legislature has statutorily placed on the execution of nighttime search warrants. It follows from this statutory analysis that the evidence seized by virtue of the authority set forth in the illegal search warrant must be suppressed. *See Henry v. State*, 373 A.2d at 578.

### Good Faith Exception Inapplicable

During the same term that it decided *Segura*, the United States Supreme Court announced the "good faith exception" to the exclusionary rule. *United States v. Leon*, 468 U.S. 897, 905–25, 104 S.Ct. 3405, 3411–211, 82 L.Ed.2d 677 (1984). In *Leon*, police officers obtained a search warrant and conducted a search for narcotics in a drug-trafficking investigation. *Id.* at 902, 104 S.Ct. at 3409. The United States District Court for the Central District of California held that the affidavit was insufficient to establish probable cause and suppressed the evidence. *Id.* at 903, 104 S.Ct. at 3410. The United States Court of Appeals for the Ninth Circuit affirmed. *United States v. Leon*, 701 F.2d 187 (9th Cir.1983). The Supreme Court modified the exclusionary rule to include an exception for good faith reliance on a search warrant which is later held to be invalid. *See United States v. Leon*, 468 U.S. at 913, 104 S.Ct. at 3415.

We find that *Leon* is not applicable to the questions presented in this appeal.

First, the precise issue framed in *Leon* was "whether the Fourth Amendment exclusionary rule should be modified so as not to bar the use in the prosecution's case in chief of evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be unsupported by probable cause." *Id.* at 900, 104 S.Ct. at 3409. It is unquestioned that the police had probable cause to search Mason's apartment during the day. The problem here is that the police failed to satisfy the requirements of 11 *Del.C.* § 2308. This section requires the articulation in the Search Warrant Application and Affidavit of facts which will satisfy the reviewing judicial officer that a nighttime search "is necessary in order to prevent the escape or removal of the person or thing to be searched for." 11 *Del.C.* § 2308. Moreover, the magistrate did not make a specific finding that a nighttime search was necessary as required by 11 *Del.C.* § 2310(c). These statutory provisions do not relate to probable cause, but to the *necessity to search a residence at night. See id. Leon* held that "the courts must also insist that the magistrate ... 'perform his 'neutral and detached' function.'" *United States v. Leon*, 468 U.S. at 914, 104 S.Ct. at 3416 (quoting *Aguilar v. Texas*, 378 U.S. 108, 111, 84 S.Ct. 1509, 1512, 12 L.Ed.2d 723 (1964)).

Second, *Leon* deals with the exclusionary rule's application to violations of the Fourth Amendment of the United States Constitution. *Id.* at 900, 104 S.Ct. at 3409. In this case, the Court is confronted with not only violations of the Fourth Amendment but also with violations of Article I, Section 6 of the Delaware Constitution, and violations of specific Delaware statutes. The police officers' actions must be consistent with all three. Even if the law enforcement activity in this case was found to comport with the federal Constitution under *Leon*, it would still have

---

**26.** The City of Newark preprinted form that was used by the police in this case stated on its face:
 \* If a night time search warrant is sought, the affiant must include facts establishing the necessity of such a warrant in order to prevent the escape or removal of the person or thing to be searched for.
Appendix to Appellant's Opening Brief at A–13.

to be found to satisfy the Delaware Constitution and statutes in order to be reasonable. As indicated above, this cannot be done.

If this Court were to find a "good faith exception," under the circumstances of this case, it would be doing so in a situation where the police did not have exigent circumstances justifying a warrantless entry, failed to allege sufficient facts to satisfy the statutory requirements for a nighttime search of a residence and then failed to receive a search warrant that concluded its nighttime execution was necessary. To render such a decision would not only be an unprecedented break with more than two hundred years of history in this area of the law, but also would be tantamount to a judicial repeal of a specific Delaware statute that for more than one hundred years has set the standards by which applications for nighttime searches of a residence are to be judged by impartial magistrates.

### Conclusion

The decision of the Superior Court denying Mason's motion to suppress the evidence seized by the police is REVERSED. The use of the illegally obtained items as evidence at Mason's trial also requires that his convictions be REVERSED.