**STATE of Delaware**

v.

**Lucille RIZZO, Defendant.**

Superior Court of Delaware,
New Castle County.

Submitted: March 9, 1993.
Decided: April 21, 1993.

Melissa Lazarich, Deputy Atty. Gen., Dept. of Justice, Wilmington, for State.

Joseph A. Hurley, Wilmington, for defendant.

## *OPINION*

COOCH, Judge.

On March 4, 1992, Lucille Rizzo (Defendant) was arrested on the following charges: (1) Driving Under the Influence of Alcohol (21 *Del.C.*, § 4177(a)); (2) Failing to Stop at the Scene of an Accident (21 *Del.C.*, § 4201(a)); (3) Failing to Report an Accident (21 *Del.C.*, § 4203(a)); and Reckless Driving (21 *Del.C.*, § 4175(a)).

Prior to her trial date, Defendant filed a motion to suppress all evidence (including chemical test evidence) resulting from her arrest. She alleges that the police officer did not have consent to enter her home and to remove her from her home without a warrant, thereby violating her right under the Fourth and Fourteenth Amendments of the United States Constitution to be free from unreasonable governmental seizures. Second, Defendant contends that her arrest did not comport with the provisions regarding warrantless arrests for motor vehicle violations contained in 21 *Del.C.*, § 701, thereby violating her rights under Delaware statutory law. A suppression hearing was held on December 17, 1992. This is the Court's decision on Defendant's motion to suppress.

## UNCONTROVERTED FACTS

At the outset, the Court notes that considerable controversy exists on the pivotal question of whether Defendant's husband, Ben Rizzo, gave permission to the police to enter Defendant's home; other facts related to the events leading to Defendant's arrest are also disputed. This introductory section includes a summary of the uncontroverted facts. The disputed evidence pertaining to these questions is discussed in Section 1, "Consent to Enter the Home."

Early in the evening of March 4, 1992, two Delaware State Police officers separately responded to a 911 broadcast of a motor vehicle accident at the intersection of Route 141 and Route 273 near New Castle. The 911 operator indicated that one of the vehicles had fled the scene and that a second vehicle had followed in pursuit. When Trooper P.N. Strohm arrived at the scene, he spoke to Sherry Miles. She told him that while she was stopped at the light at Route 141, heading southbound, the car behind her also stopped, but then accelerated and hit her vehicle several times. The striking vehicle then passed her, proceeded through the light, and hit a pick-up truck in the intersection. According to Miles, the driver seemed to be "gazing forward." The pick-up truck belonged to John Mulrooney. Strohm saw the truck and noted damage to the hood, grill

and left front fender, which he estimated to be about $1000.

Sergeant John Slank also responded to the incident and went to a Dairy Queen near Defendant's residence at 5 Rizzo Avenue to speak with John Mulrooney, who was waiting there. Mulrooney said he had been hit by a red Camaro at the same intersection, which he subsequently followed to Defendant's home located at 5 Rizzo Lane, New Castle, about two-and-a-half miles from the accident scene. While following the Camaro, Mulrooney noted that the car was being driven erratically. When the car stopped at 5 Rizzo Lane, a white female with light brown hair got out. Mulrooney informed her that she had hit his truck, and she responded with words to the effect that "I don't know what you're talking about. You'll have to talk to my husband." Mulrooney then drove to the Dairy Queen. He told Slank that he believed the woman was either inebriated or on drugs.

Slank went to the Rizzo address, where he found Ben Rizzo sitting on the front step, and he observed a somewhat damaged red Camaro parked in the driveway. Rizzo told Slank that the car was his, but when Slank asked him if he could speak to his wife, Rizzo said that his wife was not home. During this conversation, and about 30 minutes after the accident had been reported on police radio, Trooper Strohm arrived at the Rizzo address. After several minutes of conversation with the two troopers, Rizzo walked toward his house and Strohm followed. Rizzo opened the door and went in, with Strohm a few paces behind him. Lucille Rizzo was inside.

Strohm identified himself and told her he was investigating the accident at Routes 141 and 273. According to Strohm, Defendant initially denied being in an accident, but then stated without further explanation, "I didn't hit him. He hit me." She became hysterical and started screaming, which Slank could hear from outside. Strohm noticed that Mulrooney's description of the driver fit Defendant, who showed signs of inebriation, including a flushed face, bloodshot eyes, and slurred speech. Strohm also detected an odor of alcohol emanating from her person. Defendant denied having consumed any alco-

hol since the accident. Strohm then brought her to the Dairy Queen, where Mulrooney identified her as the person he had seen driving the red Camaro. Lucille Rizzo was then formally placed under arrest for the charges listed above.

## DISCUSSION

### 1. *Consent to Enter the Home*

Defendant seeks to suppress all evidence resulting from her allegedly illegal arrest, which she asserts took place when Trooper Strohm removed her from her home. The State does not contest that an "arrest" occurred when Defendant was removed from her home, despite the fact that a formal oral statement of her arrest was not made until after the defendant had been positively identified by Mulrooney at the Dairy Queen.

Although no controversy has arisen on this point, it is necessary to clarify which event is meant by the term "arrest." Was Lucille Rizzo arrested when she was removed from her home by Trooper Strohm or when the formal charge was made at the Dairy Queen? Arrest is defined (11 *Del.C.*, § 1901(1)) as "the taking of a person into custody in order that he may be forthcoming to answer for the commission of a crime." An arrest need not be couched in the formal language of arrest; "[i]t is enough that the suspect understand that he is in the power of the one arresting and/or that his locomotion is impeded." *State v. Korotki*, Del.Super., 418 A.2d 1008, 1011 (1980). When the formal indicia of arrest are lacking, as in the case at bar, a seizure of the person has occurred when, in view of all the circumstances, a reasonable person would believe that he is not free to leave. *Michigan v. Chesternut*, 486 U.S. 567, 574, 108 S.Ct. 1975, 1980, 100 L.Ed.2d 565, 572 (1988); *Robertson v. State*, Del.Supr., 596 A.2d 1345, 1351 (1991). Since this description aptly fits the circumstances of Mrs. Rizzo's removal from her home back to the scene of the accident, the Court will consider her removal from her home to be the time of her "arrest" for purposes of this discussion.

Defendant argues that Strohm did not have consent from Ben Rizzo or herself to enter the home and that his entry therefore violated her rights under the Fourth Amendment. She contends that the State failed to meet its burden in showing that an effective consent was given, relying primarily on testimonial discrepancies. The State maintains that the factual record establishes that consent was given and emphasizes in particular Ben Rizzo's inability to recall what the troopers said to him.

Because of the profound respect afforded to the privacy of the home both by the Fourth Amendment and by society at large, a considerable body of law has evolved on this issue. The leading cases reveal a potent judicial concern for the rights of a person who has closed the door, both literally and figuratively, upon the world. The highest courts have made it clear that the government takes serious action when it steps through that door without the warrant that rightfully grants its entry. On balance, however, there are times when the needs of the police will override the individual's stake in undisturbed privacy. The clash of these two interests demands that this Court take a long and careful look before deciding whether the police in the case *sub judice* had received consent to enter the defendant's home or whether they entered of their own initiative and without authority of law.

In the leading case of *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973), the Supreme Court addressed itself to consensual searches and held, *inter alia*, that the question of whether a consent to a search was made voluntarily must be based on all of the circumstances. It is well-established that the State bears the burden of showing that an effective consent was given, and courts may not lightly infer such consent. *United States v. Patacchia*, 602 F.2d 218, 219 (9th Cir. 1979). The United States Supreme Court has also found that the considerations pertinent to challenges to a warrantless search are equally relevant to a warrantless entry of a suspect's home. In the landmark case on this issue, *Payton v. New York*, Justice Stevens, joined by five other members of the Court, stated that "[i]n terms that apply equally to seizures of property and to sei-

zures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house." *Payton v. New York,* 445 U.S. 573, 590, 100 S.Ct. 1371, 1382, 63 L.Ed.2d 639, 653 (1980).[1] Furthermore, the State does not meet its burden of showing consent to enter merely from the defendant's failure to object to the entry, since this would in essence shift the burden from the state to the defendant to show unequivocal objection to a police entry. The burden remains squarely on the State to show that an unequivocal and specific consent to enter was granted to the police. *United States v. Shaibu,* 9th Cir., 920 F.2d 1423, 1427–1428 (1990).

■ The question of consent was a central issue at the suppression hearing. Whether or not consent was given is a question of fact that devolves on verbal exchanges among Ben Rizzo, Sergeant Slank and Trooper Strohm. A summary of the testimony on the issue of consent follows.

Trooper Slank testified that when he arrived at the Rizzo address, he found Ben Rizzo sitting on the steps outside the building. According to Slank, Ben Rizzo acknowledged that he owned the damaged red Camaro in the driveway and that Slank's description of the driver involved in the accident fit his wife. Slank also testified that when he told Rizzo he wanted to talk with his wife, Rizzo said she was not at home. Later in the conversation, Slank again asked for Rizzo's permission to go in and talk to his wife.

Rizzo told Slank that it was "okay" for Slank to talk to Defendant.

Trooper Strohm testified that when he arrived at the Rizzo residence, Ben Rizzo was standing in the driveway with Slank and that he told Ben Rizzo that he was investigating an accident involving the Camaro. After Strohm joined the other two men, he asked Rizzo for permission to go inside and interview Defendant. Strohm testified that Ben Rizzo agreed, saying that it was "okay [for Strohm] to come in." Strohm then followed Rizzo down the path and into the home. Strohm testified that Ben Rizzo seemed "just as anxious [as Strohm] about the accident and [Rizzo] also wanted to get to the bottom of this." According to Strohm, Rizzo entered first, stepping aside to hold the door for Strohm to enter.[2] Once inside the house, Ben Rizzo called out to his wife.

Ben Rizzo testified that he was "upset" and was sitting on the step trying to calm down after seeing the damage to the car when Sergeant Slank arrived. Although he recalled talking to Slank, Ben Rizzo's testimony (contrary to that of Slank) was that he didn't "think" Slank asked if he (Slank) could go inside. He also had no recollection of any conversation with Trooper Strohm (contrary to both officers' testimony). In fact, he could not remember clearly what either officer said to him. To an extent, this is understandable in light of Ben Rizzo's agitated state at the time.

---

1. Delaware law also reflects the concept of the home as a privileged place. As stated by the Delaware Supreme Court in *Mason v. State,* Del. Supr., 534 A.2d 242, 246 (1987), "[t]he concept of a home as a privileged place, the privacy of which may not be disturbed by unreasonable governmental intrusion, is basic to a free society."

The *Mason* court also pointed out that Delaware adopted a Bill of Rights with protections against unreasonable searches and seizures into its Constitution on September 11, 1776, fifteen years prior to the adoption of the federal Bill of Rights. The present Delaware Constitution contains the following provisions:

The people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures; and no warrant to search any place, or to seize any person or thing, shall issue without describing them as particularly as may be; nor then, unless there

be probable cause supported by oath or affirmation.

Del. Const. art. I, § 6. *See also Henry v. State,* Del.Supr., 373 A.2d 575 (1977); *Pierson v. State,* Del.Supr., 338 A.2d 571 (1975).

2. Defendant points out that although Trooper Strohm's police report said that Ben Rizzo "invited" Strohm in, oral testimony indicated that Strohm initiated the entry by asking Rizzo if he could come in and talk to his wife to find out what happened and whether she was involved in an accident. It was in response to this question that Rizzo said it was "okay" for Strohm to enter the home. If this is a discrepancy, it is a minor one, indeed. Trooper Strohm's question was neither overbearing nor coercive and does not otherwise dissipate the voluntariness of Rizzo's affirmative response.

In important contradiction to the testimony of both troopers, Rizzo testified that he was certain that Slank, not Strohm, entered his home. He stated that after entering the house, he turned around because he didn't hear the door close behind him, and only then did he see a trooper in his foyer. According to Rizzo, the trooper (whom he maintained was Slank, not Strohm) said something like "You don't mind if I come in, do you?", to which Rizzo replied, "You might as well." [3]

In addition to the testimony itself, the Court had the opportunity to observe the demeanor of the witnesses and to gauge their credibility. The appropriate standard by which to assess the facts pertaining to the consent issue is the standard of the "totality of the circumstances," as indicated in *Schneckloth v. Bustamonte,* 412 U.S. at 218, 93 S.Ct. at 2041. Furthermore, the "touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno,* 500 U.S. 248, ——, 111 S.Ct. 1801, 1803, 114 L.Ed.2d 297, 302 (1991). As such, reasonableness is the determinative criterion is assessing the circumstances which led to Trooper Strohm's warrantless entry into the Rizzo home.

With this criterion in mind, the Court takes note of the following facts. First, Ben Rizzo had only recently discovered the damage to his car and was, by his own admission,

"upset." Second, the State Police officers informed Ben Rizzo that they were investigating an accident involving a driver who fit his wife's description. Third, the police told Rizzo that they wanted to speak with his wife about the accident. Fourth, the state police officers repeated their request to go inside and speak with Mrs. Rizzo. The sum of these facts is that, despite Ben Rizzo's troublesome memory, the totality of the testimony supports the State's contention that Rizzo affirmatively agreed to the entry.[4] Thus, after considering all the circumstances under the standard of objective reasonableness, this Court is satisfied that a voluntary consent was given for the entry and that the subsequent seizure of Defendant did not violate her constitutional rights under the Fourth and Fourteenth Amendments to the United States Constitution.[5]

## 2. *Exigent Circumstances*

Defendant also contends that the troopers lacked the exigent circumstances necessary to overcome the constitutional requirement of a warrant. However, having found that an effective consent to enter the home was given, the Court need not reach the question of whether the troopers were acting under exigent circumstances sufficient to validate a warrantless arrest at the defendant's home.[6]

---

**3.** The Court notes (as was also emphasized by Defendant's counsel) that neither Defendant nor her husband had apparently been made aware of the possible legal significance of the facts pertaining to consent by Defendant's counsel prior to the suppression hearing; Defendant and her husband both testified, and her counsel represented to the Court, that counsel had not purposely explored the possible impact of the consent question with them regarding the outcome of the case.

**4.** The troopers did not explain to Mr. Rizzo that he had the right to refuse them entry to his home. This fact is but one of many potential factors in a totality of the circumstances analysis, and the Supreme Court has laid to rest the theory that police have a duty to inform people that they have the right to deny police entry to their homes. *Schneckloth v. Bustamonte, supra,* 412 U.S. at 227, 93 S.Ct. at 2048.

**5.** Another prerequisite to a valid warrantless arrest is probable cause. *Beck v. Ohio,* 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); *Thompson v. State,* Del.Supr., 539 A.2d 1052 (1988).

However, since Defendant does not challenge this aspect of her arrest, the Court assumes, and otherwise finds from the facts, that the police had probable cause both to remove Defendant from her home and also potentially to have arrested her at the scene of the accident.

**6.** Any inquiry into warrantless home arrests begins with the proposition set forth in *Payton v. New York,* 445 U.S. at 573, 100 S.Ct. at 1373, stating that felony arrests made in a suspect's home without benefit of a warrant are prohibited by the Fourth Amendment, absent probable cause and exigent circumstances. In reaching this decision, the *Payton* Court specifically refrained from defining the type of exigent circumstances which would justify a warrantless home arrest.

This inquiry was taken up in *Welsh v. Wisconsin,* 466 U.S. 740, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984), which the defendant urges on this Court as a factual and legal parallel to her own case. The distinctive difference in *Welsh* is that the state trial court never addressed the question of consent, predicating its decision instead on a

### 3. *Delaware Statutory Law*

In addition to her constitutional claims, Defendant claims that her arrest violated Delaware statutory law. She urges that her arrest is invalid under 21 *Del.C.,* § 701(a), which authorizes police officers to make warrantless arrests for motor vehicle violations "committed in their presence," and is also invalid under 21 *Del.C.,* § 701(b), which validates arrests made without a warrant "at the scene of a motor vehicle accident." [7] The State replies that recent Delaware case law reveals a trend toward broad judicial interpretation of both these provisions. Because each of those cases represents that court's application of the generalized statutory language to a particular set of facts, the Court

turns for guidance to the rationale behind each decision, not just to the holding itself.

 Although the State argues strenuously that Defendant was validly arrested for a violation that occurred in the presence of the police, pursuant to § 701(a), the Court finds scant support for this contention. In support of its position, the State urges that the Court find *Halko v. State,* 54 Del. 180, 175 A.2d 42 (1961) determinative. In *Halko,* a police officer arrested a suspect without benefit of a warrant after a witness had described the suspect's erratic driving and after the officer had found the suspect passed out at the wheel of the car with a wine bottle propped up between his legs. The officer was acting

---

finding of exigent circumstances. The Court stated that, "[o]n remand, the state courts may consider whether the petitioner's arrest was justified because the police had validly obtained consent to enter his home." *Id.* at 755, note 15, 104 S.Ct. at 2100 n. 15.

In regard to a warrantless search of a suspect's home, the Delaware Supreme Court has relied squarely on both *Payton* and *Welsh* for its finding that exigent circumstances can qualify as an exception to the warrant requirement. *Mason v. State,* Del.Supr., 534 A.2d 242, 248 (1987).

Thus, if the Court in the case *sub judice* had not found that Ben Rizzo consented to the trooper's entry into his home, the inquiry into exigency would begin with the guidance provided by *Payton, Welsh,* and *Mason.* The focus of the inquiry would be sharpened by the language of 21 *Del.C.,* § 4177 (Driving Under the Influence), which provides in pertinent part:

(b) Any person charged under subsection (a) of this section whose blood concentration is one tenth of 1% or more by weight as shown by a chemical analysis of a blood, breath or urine sample *taken within 4 hours of the alleged offense* shall be guilty of violating subsection (a) of this section. (Emphasis added.)

Thus, when a person has been charged with driving a vehicle while under the influence of alcohol or drugs, a test of the type described in subsection (b) above establishes that person's guilt, if the test is administered within 4 hours of the alleged offense. *See Coxe v. State,* Del.Supr., 281 A.2d 606 (1971) (holding that statute providing that a person who drives motor vehicle after his blood has reached blood alcohol concentration of one-tenth of 1% or more by weight shall be guilty of driving motor vehicle under the influence of alcohol was not unconstitutional).

To date, no Delaware court has been called upon to determine whether § 4177 statutorily establishes the exigent circumstances necessary to override the warrant requirement when the suspect has retreated to his or her home. In *Singleton v. Voshell,* Del.Super., C.A. No. 92A-

06-001, 1993 WL 54438 Barron, J., (January 27, 1993) (MEMORANDUM OPINION), this court declined the defendant's invitation to decide this issue because the record did not indicate that the arresting officers had any knowledge of the defendant's alcohol consumption at the time of the arrest. However, the court suggested that the 4-hour time limit on chemical testing created by 21 *Del.C.,* § 4177, interpreted in light of *Payton* and its progeny, may indeed create such a possibility. *Singleton v. Voshell,* at 10. In *Morrow v. State,* Del.Supr., 303 A.2d 633 (1973), the court appeared to identify the need of police to take blood from a suspect in a Driving Under the Influence case within the statutory period as a factor in determining whether a hospital room was an extension of the "scene of the [motor vehicle] accident." 303 A.2d at 635; see fn. 8, *infra.* The *Morrow* court did not analyze this question from the viewpoint of "exigent circumstances." As was the case in *Singleton,* this Court need not decide that issue.

7. The pertinent sections of 21 *Del.C.,* § 701 provide as follows:

(a) The Secretary of Public Safety, his deputies, motor vehicle inspectors, State Police, state detectives and other police officers authorized by law to make arrests for violation of the motor vehicle and traffic laws of this State, provided such officers are in uniform or displaying a badge of office or an official police identification folder, may arrest a person without a warrant:

(1) For violations of this title committed in their presence....

(b) Any police authorized to arrest without warrant under subsection (a) of this section is further authorized at the scene of a motor vehicle accident, upon reasonable and probable cause to believe, based upon personal investigation which may include information obtained from eyewitnesses, that a violation has been committed by any person then and there present, to arrest such person without a warrant of arrest.

pursuant to former 21 *Del.C.*, § 701 (now amended) which authorized police to arrest "upon view" for violations of the motor vehicle law. *Id.* at 46. After acknowledging that the statutory language was controlling, the Court went on to assert the necessity of a "liberal and reasonable" interpretation of the phrase "upon view," and held that the arrest was made for a violation "on [sic] view" of the police. *Id.* at 47.

The many distinctions between *Halko* and the case at bar appear obvious. First, as pointed out by the *Halko* Court, the "upon view" language was enacted in 1907 when the speed limit was 20 mph and "the motor vehicle certainly did not present the problem of law enforcement that it now presents." *Id.* at 46. Second, in 1968, the legislature reconsidered the statute and amended it with the now-current version of 21 Del.C., § 701(a). Finally, the facts in this case are crucially different in that neither Slank nor Strohm ever saw Defendant at the scene of the accident and therefore had no firsthand knowledge of her possible intoxication until Strohm was inside her home. Thus, the Court is satisfied that *Halko* provides no basis for a finding that Rizzo's violation occurred in the presence of the police, pursuant to 21 *Del.C.*, § 701(a).

The State also relies on *Morrow v. State,* Del.Supr., 303 A.2d 633 (1973), to support its contention that Defendant's arrest was valid under § 701. The *Morrow* court was primarily concerned with interpreting the phrase "at the scene of a motor vehicle accident" found in § 701(b). The court held that where "... the existing crisis on the highway ... required the removal of the injured defendant to [a hospital]," the hospital's emergency room was a proper extension of the scene of the accident pursuant to § 701(b). *Id.* at 634. The State points to the Court's observation that because of the necessity of taking the defendant to the hospital, the offense could "reasonably be said to have taken place *in the presence of the arresting officer.*" (Emphasis added.) *Id.*

However, this solitary statement, not entirely germane to a § 701(b) analysis, is subordinate to the Court's central reasoning and holding that a hospital can be considered to be the "scene of a motor vehicle accident" when the defendant is taken there at the direction of the police at the accident scene for reasons of medical necessity.[8]

*Morrow* thus provides little enlightenment on the appropriate interpretation of what it means to violate the motor vehicle law in the presence of an officer pursuant to 21 *Del.C.*, § 701(a). Nor does *Morrow* offer the State much support under § 701(b) since *Morrow* and the case *sub judice* are factually inapposite. The officer in *Morrow* saw the defendant at the scene and detected signs of intoxication firsthand, unlike Slank and Strohm who saw Defendant for the first time in the confines of her own home. For these reasons, *Morrow* is not analogous and fails to persuade the Court that Defendant was validly arrested under either subsection of 21 *Del.C.*, § 701.

The State also cites *Cagle v. State*, Del.Super., Cr.A. No. 1087, 1973, Taylor, J., (February 26, 1974) (MEMORANDUM OPINION) as standing for the proposition that § 701(b) is to be interpreted liberally. In *Cagle*, the court construed an arrest made 100 yards from the accident to be valid as an arrest "at the scene of a motor vehicle accident." The defendant in *Cagle* argued that for purposes of 701(b), he was not at the scene of the accident, thus rendering his arrest illegal; however, he also contended that with regard to whether he had fled the scene of an accident in violation of 21 *Del.C.*, § 4201, he had not left the scene. In reaching its decision that the phrase "at the scene of a motor vehicle accident" would be given the same meaning in both statutes, the court also stated that the precise meaning of the phrase will depend on the facts of a given case. The court concluded that the defendant's admission regarding § 4201 (that he had not left the scene) was equally determinative in regard to the arrest, thus validating his arrest

---

8. The *Morrow* court cited the need for police to take the blood test within the statutorily required four-hour period as one of several reasons for deeming a hospital room the "scene of the acci-

dent." *Id.* However, that similarity with the instant case is not otherwise sufficient to make *Morrow* controlling.

under § 701(b). *Cagle* therefore provides no parallels either factually or legally to the case at bar. It does, however, guide this decision with its reminder that this is a fact-based question whose answer will vary from case to case.

In *Singleton v. Voshell, supra,* the court considered a challenge to a warrantless arrest for a motor vehicle violation where the police officers went to the suspect's home (which was about eight blocks from the scene of the accident) and arrested him there within several minutes of the accident being reported. In applying § 701(b) to these facts, the *Singleton* court held, *inter alia,* that "when the police, without a warrant, arrest a suspect within several minutes of and at a location near the accident scene, they have arrested him 'at the scene,' pursuant to section 701(b)." *Id.,* at 12.[9]

Defendant here points out that none of the preceding cases involves a distance of two-and-a-half miles between the accident and the suspect's home. Defendant also seeks to evade the *Singleton* court's phrase "within several minutes" by stating that there is no clear indication as to when the Rizzo accident occurred. However, the "several minutes" in *Singleton* was the lapse of time between the first officer's arrival at the scene and the arrival of the assisting officers at the suspect's home, not the time from the accident until the arrest. *Singleton v. Voshell,* at 12. In the case *sub judice,* Defendant was arrested about 30 minutes after the accident was reported and at a location approximately two-and-a-half miles from the scene from the accident. Thus, both the temporal and lineal measurements are significantly greater here than in *Singleton.*

The wisdom derived from the preceding cases is that both subsections of § 701 can be applied correctly only by adhering closely to the given facts. The crux of the issue before this Court is: how far may the language "in the presence of" and "at the scene" extend? This question raises significant policy considerations, as noted in *Singleton:*

> Deaths associated with motor vehicle accidents and more specifically with alcohol- and drug-related accidents are tragedies that can be significantly reduced by the effective enforcement of our State's motor vehicle laws. In light of this important interest shared by the public and the State alike, *Delaware Courts have given a broad construction to the phrase "at the scene of an accident."* (Emphasis added.)

*Id.* at 12. However, even a "broad construction" can be pressed beyond appropriate limits. The provisions of § 701 limiting warrantless arrests would be rendered virtually meaningless by a judicial finding that Lucille Rizzo's arrest did not violate her rights under this statute. This Court therefore holds that when police officers travel 2 and ½ miles from the scene of an accident to the home of a person suspected of violating the law with regard to that accident, and thereafter enter the home and arrest the suspect 30 minutes after the accident was reported, the violation did not occur "in their presence," pursuant to 21 *Del.C.,* § 701(a), nor have they arrested her "at the scene of a motor vehicle accident" as authorized in 21 *Del.C.,* § 701(b).

This is a narrow holding, tailored to the particular facts of this case, and does not diminish or otherwise impact the judicial grants of authority made in other decisions. Rather, this holding reflects the legislature's intent in authorizing police without a warrant to arrest a person suspected of violating the law before the suspect has, by any reasonable temporal and/or lineal criteria, left the scene of a motor vehicle accident.[10]

---

9. The court also held that when the arrest is made in the suspect's home, the constitutional requirement of exigent circumstances outweighs the statutory grant of authority to make an arrest without a warrant. *Id.* at 13. However, in the case at bar, this Court has found that consent was given for the entry, thus negating any need for inquiry into the existence of exigent circumstances.

10. The Court recognizes that evidence (such as the blood alcohol level) in a Driving Under the Influence case can disappear relatively quickly. *See Morrow v. State,* 303 A.2d at 635. Any requirement to obtain an arrest warrant, pursuant to § 701(b), where an arrest cannot be made "at the scene of a motor vehicle accident," may, in some circumstances, impact detrimentally on efforts by police to enforce 21 *Del.C.* § 4177 (Driving Under the Influence). Nevertheless, this Court cannot ignore the fact that § 701(b) autho-

### 4. *Suppression of the Evidence*

■ The ultimate issue raised by these facts is whether evidence gathered as a result of an arrest that is constitutionally valid, but statutorily illegal, must be excluded. As an issue that has not been explicitly decided in Delaware, this question warrants careful attention to any guidance from the Delaware Supreme Court.[11]

The United States Supreme Court has yet squarely to decide this question. A somewhat analogous issue was raised in *Michigan v. DeFillippo*, 443 U.S. 31, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979), where the Court held that evidence discovered as a result of a warrantless arrest made in good faith reliance on an ordinance subsequently declared unconstitutional need not be suppressed where the arresting officer had probable cause to make the arrest. In *DeFillippo*, the Court found that the statute in question was unconstitutional; in this case, Defendant has not challenged the constitutionality of § 701 but contends instead that the state troopers did not comply with the statute.

In *Vorhauer v. State*, 59 Del. 35, 212 A.2d 886 (1965), the Delaware Supreme Court held that where a defendant's custody violated the statutory detention period, his incriminating statements made during that period were inadmissible as a matter of law, without regard to voluntariness. In reaching this finding, the court stated:

> We find here a flagrant disregard of both § 1911 and [Super.Ct.Crim.] Rule 5. The exclusion in criminal trials of evidence obtained as a result of such violation of the law is the most practical and effective means at the disposal of our courts for the avoidance of similar violations in the future. We adopt such means to enforce the law, seeking to deter unlawful detentions just as we have sought to deter unlawful arrests. *The law may not be enforced by disobedience of the law.* (Emphasis added.)

*Id.* 212 A.2d at 893.

The Delaware Supreme Court has also held that suppression of evidence is mandated when the defendant's detention has been found to be invalid under 11 *Del.C.*, § 1909

---

rizes the police to make warrantless arrests for motor vehicle violations only "at the scene of a motor vehicle accident."

Any broadening of the power of the police to make warrantless arrests for motor vehicle violations (not at the scene of motor vehicle accidents), particularly for suspected violations of § 4177, should occur by statutory change duly enacted by the General Assembly.

11. A minority of state courts has held that the *per se* exclusionary rule will not be applied when police officers have overstepped statutory provisions regarding warrantless arrests. In *State v. Eubanks*, N.C.Supr., 196 S.E.2d 706 (1973), the court held that "[N]othing in our law requires the exclusion of evidence obtained following an arrest which is constitutionally valid but illegal for failure to first obtain an arrest warrant." A Michigan court found no reason to suppress evidence in such a case (where there was a statutory, but not a constitutional, violation) since the "deterrance function is adequately served by the fact that the officer can be held personally liable for damages in a civil action for false arrest." *People v. Bardo*, 56 Mich.App. 48, 223 N.W.2d 358 (1974). The *Bardo* Court reasoned as follows:

> Defendant's arrest not being invalid in the constitutional sense and therefore not subject to the constitutionally mandated *per se* exclusionary rule, the question thus becomes whether

the State, as a matter of its own public policy, should fashion a similar exclusionary rule with respect to statutorily illegal arrests. We have not found any Michigan precedent which would mandate such a rule, nor do we find that such a rule is necessary to protect the basic rights of one illegally arrested as was the defendant herein. Where, as here, the officer had probable cause to believe that the crime had been committed, and therefore, had the constitutionally required basis to search and seize, there would appear to be no need to suppress such evidence, even though the arrest was statutorily illegal.

*Id.* 223 N.W.2d at 360–361.

More recently, the Virginia Court of Appeals considered an issue raised by a defendant who argued that his warrantless arrest for littering was invalid because the violation had not been committed in the officer's presence, as required by statute, but was radioed to the officer by a fellow officer who was working surveillance in the area. The defendant further contended that the cocaine discovered on his person during the patdown should be suppressed as being the result of an illegal arrest. The Court held that when a warrantless arrest is made for a misdemeanor not committed in the officer's presence, the evidence need not be suppressed "in the absence of any deprivation of constitutional rights." *Penn v. Commonwealth*, Va.App., 13 Va.App. 399, 412 S.E.2d 189, 194 (1991).

and Super.Ct.Crim.R. 5(a). *Warren v. State,* Del.Supr., 385 A.2d 137 (1978). And, in yet another case regarding an illegal detention, the court opined, "[T]he exclusionary rule with which we deal here is a rule of evidence, adopted by the courts as an instrument to implement the proper administration of criminal justice; and it does not stand upon constitutional grounds." *Webster v. State,* Del. Supr., 213 A.2d 298, 301 (1965).

The guidance provided by the Delaware Supreme Court leads to only one conclusion in this case. A clear symmetry exists between illegal arrests and illegal detentions, both of which impinge upon the liberty interest which is paramount to these considerations. The only remaining question is which way the scales will tip when this liberty interest is weighed against the importance of enforcing Delaware's motor vehicle laws. It is essential for police officers to be able to do their jobs unfettered by useless or merely theoretical restraints. However, this Court believes that the language of 21 *Del.C.,* § 701 and the guidance of the Delaware Supreme Court in *Vorhauer* and its progeny set limits on the legality of warrantless arrests pertaining to motor vehicle violations. Although

Defendant's husband granted the state troopers the affirmative consent required by the Fourth Amendment to the United States Constitution, the legislature of this state has limited the circumstances under which police may arrest a suspect in a motor vehicle incident, not at the scene of the accident, without a warrant. The warrantless arrest of Mrs. Rizzo in her home falls outside these parameters.

## CONCLUSION

For the foregoing reasons, this Court finds that all evidence, including statements and the chemical test results, gathered as a result of the seizure of Defendant at her home in violation of 21 *Del.C.,* § 701 must be suppressed. Defendant's motion to suppress is therefore GRANTED.

IT IS SO ORDERED.