Hector S. BARROW, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

Jermaine Barnett, Defendant
Below, Appellant,

v.

State of Delaware, Plaintiff
Below, Appellee.

No. 64 1998, 107 1998, 65 1998, 97 1998.

Supreme Court of Delaware.

Submitted: Nov. 9, 1999.
Decided: Feb. 3, 2000.

Anthony A. Figliola, Jr. (argued), Figliola and Facciolo, and Sheryl Rush–Milstead, Wilmington, Delaware, for appellant, Hector S. Barrow.

Thomas A. Foley (argued) and Jerome M. Capone, Wilmington, Delaware, for appellant, Jermaine Barnett.

Loren C. Meyers, Chief of Appeals Division, Timothy J. Donovan, Jr., William E. Molchen (argued), and Thomas E. Brown (argued), Deputy Attorneys General, Department of Justice, Wilmington, Delaware, for appellee.

Before VEASEY, C.J., WALSH, HOLLAND, HARTNETT, and BERGER, JJ., constituting the Court en Banc.

WALSH, Justice:

This is the direct appeal of co-defendants, Jermaine Barnett and Hector S. Barrow, from convictions in the Superior Court arising out of the 1995 shooting death of Thomas Smith inside his residence/gun shop.[1] Each defendant was convicted of Intentional Murder First Degree, Felony Murder First Degree based on Recklessness, Felony Murder First Degree based on Criminal Negligence, Robbery First Degree, Burglary Second Degree, Conspiracy First Degree, Conspiracy Second Degree and Possession of a Firearm During the Commission of a Felony. The First Degree Murder conviction resulted in the imposition of death sentences.

Both defendants challenge the *voir dire* of prospective jurors for "death qualification." They also allege violations of their

---

1. Although filed separately, these appeals were consolidated for briefing, argument and disposition.

confrontation rights and the improper admission of an out-of-court statement of an admitted participant in the robbery. Barnett separately disputes the State's use of peremptory challenges and the trial court's refusal to permit the introduction of evidence during the penalty hearing regarding his cooperation with the police. Barrow separately claims violation of an international treaty in connection with his arrest and illegal detention.

After a careful review of the record and extensive submissions by the State and the defendants, we conclude on the basis of the United States Supreme Court's recent holding in *Lilly v. Virginia*, 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999), that the admission of a third co-defendant's statement violated the Confrontation Clause of the Federal Constitution and that the resulting prejudice tainted the convictions of Intentional Murder First Degree. We also find error in the Superior Court's refusal to permit Barnett to present evidence of his cooperation as mitigation in the penalty phase. We do conclude, however, that there is sufficient evidence, absent the disputed statement, to support the convictions of Felony Murder as to both defendants. We find no merit to the remaining claims of error.

Our reversal of the Intentional Murder convictions requires a new trial as to those charges, should the State elect to pursue them. In any event, our affirmance of the Felony Murder convictions requires a new penalty hearing because of the Confrontation Clause violations.

I

At approximately 4:40 p.m. on June 25, 1995, police responded to a 911 call at the Black Sheep Sports store, a combination gun shop and residence on Lancaster Pike in New Castle County. The 911 caller, Barbara Fisher, and her cousin, Patricia Johnson, who were sitting on Fisher's front porch behind the gun shop on the day in question recounted the following events to the responding officer. They had observed three black males wearing baseball caps approaching the gun shop. Their suspicions were aroused because they had seen the same three individuals walking around the shop earlier in the day. According to Fisher, one of the men stood lookout while the other two entered the shop. Several minutes later, Fisher and Patricia Johnson heard a noise that sounded like a car backfiring, at which point they saw the lookout leave his vantage point and approach the entrance to the shop. Soon thereafter, the three men left the shop with a large brown bag, walking toward the nearby Lancaster Court Apartments (the "Apartments").

Two other witnesses observed the men as they made their way from the gun shop to the Apartments. The first, Terri Ewald, a delivery driver for a pizza shop in a nearby strip mall, was taking a cigarette break behind the strip mall when she saw the men walking across a field towards the Apartments. Ewald testified that one walked ahead while the other two carried a heavy-looking brown bag. She described the man in front as a very dark-skinned black male, about five feet eight inches tall, medium build and clean shaven. He was wearing jeans, a striped shirt with a white collar and white sneakers. Ewald described the man carrying the bag nearest her as a black male of medium complexion, approximately five feet eight inches tall and medium build but slightly smaller in size than the man walking ahead. He was wearing blue jeans, a dark shirt, a hat and bright white sneakers. Ewald described the last man as a very light-skinned black male, about five feet eight inches tall and wearing baggy, khaki-colored jeans. She also described this man as being the youngest in appearance of the three.

The other witness, Morris Cotton, a resident of the Apartments, was performing routine maintenance on his car outside Building 2 when the three men passed by him and went in the back door of Building 2. He testified that one was moving at a

slow jog approximately thirty seconds ahead of the other two who were carrying the brown bag. Cotton described the man in front as a dark-skinned black male in his early twenties, approximately five feet nine to five feet ten inches tall, medium build and wearing a black outfit, black and white sneakers and a black cap. Cotton described the man closest to him carrying the bag as a black male of a medium complexion in his early twenties but younger than the man in front, approximately five feet ten inches tall and medium build with close cut hair and no hat. He described the other man carrying the bag as lighter-skinned and younger than the others. Cotton testified that this man was not wearing a hat and was not quite as tall as the other man carrying the bag but was taller than the man in front. He also stated that one of the men with the bag wore a "light tan, brownish color, short outfit." Lastly, Cotton testified that he had seen the man in front and the man closest to him carrying the bag several times before in Building 2 and later identified Barrow and Barnett as these men, respectively.

Upon entering the gun shop, the police discovered Thomas Smith, the owner and resident of the building, dead of a single "execution style" gun shot wound to the head. Although there were no signs of forced entry, the police noted missing handguns, ammunition and money. Based on the eyewitness accounts mentioned above, the police quickly focused their search on Building 2 of the Apartments and cordoned off the area allowing no entry or exit to anyone.

Corporal Jeffrey Hale of the Delaware State Police eventually came to Apartment 2C of Building 2. After being admitted by Dennis Thomas,[2] Hale observed Lawrence Johnson on the floor pretending to sleep. He further noted yellow pants on the floor near Johnson consistent with one of the

witness' description of the clothing worn by one of the three suspects.

Shortly thereafter, police observed Hector Barrow leaving Building 2. When questioned, Barrow gave police a false name and address. Approximately two hours later, Jermaine Barnett exited Building 2 carrying a basketball. He told officers that he had just been upstairs taking a shower. The officers noted, however, that he was very dirty and sweaty. Barnett also gave a false name and birth date. The police eventually took Johnson, Barrow and Barnett into custody.

Early the next morning, the police secured and executed a search warrant for Apartment 2C. Inside, they found guns and ammunition stolen from the gun shop. Ultimately, the police traced every gun recovered in the apartment to Black Sheep Sports except one, a .38 caliber handgun, which ballistic tests revealed as the murder weapon. In the yellow pants found next to Johnson, the police discovered Smith's keys to the gun cabinet, change consistent with that taken from Smith's till and part of a pen owned by Smith. The police also recovered: (i) two pairs of gloves similar to those described by witnesses as being worn by the two individuals who entered the store containing gunshot residue; (ii) a large brown bag matching similar descriptions; and (iii) hollow-point .38 caliber ammunition consistent with the bullet that killed Smith.

Thomas testified at trial that Barrow, Barnett and Johnson were visiting the apartment on June 25. According to Thomas, on the afternoon of the murder, the three men left the apartment only to return a short time later. He overheard Barrow saying that Smith was asleep and the trio again left the apartment. Approximately fifteen minutes later, Barrow hurried through the front door, dumped several guns on a chair and proceeded to open the back door. Johnson and Barnett en-

2. Thomas is the nephew of the tenant of record at the time, Christine Edwards. Thomas had lived in Apartment 2C for a little over a week and was not well acquainted with Lawrence Johnson or the two defendants.

tered the back door with a large brown bag. The three men then went into the bedroom and removed several firearms from a brown bag amidst celebration and congratulatory gestures on a job well done. During these festivities, Barrow exclaimed "I shot the bomba cloth," apparently referring to Smith.[3] Soon after, however, when police helicopters were heard overhead, the celebration apparently ended. All three individuals changed clothing and the events of the evening unfolded.

Although the State elected to try Johnson separately, an omnibus suppression hearing was held in May of 1996 to consider the pretrial motions filed by all three defendants. Johnson, who was a juvenile at the time, filed a motion to suppress certain statements made by him on the grounds that: (i) his statements were not made voluntarily and (ii) the police failed to comply with the mandatory presentment and notification requirements of 10 *Del. C.* § 1004(2) and Family Court Rule 5(b)(1)(b).[4] Although these statements ruled Johnson out as the shooter, they constituted an admission that he was the lookout outside the gun shop and a willing participant in the robbery. Prior to Johnson's trial, the judge announced his ruling suppressing the statements on the grounds that the police violated the procedural safeguards of 10 *Del. C.* § 1004(2) and Family Court Rule 5(b)(1)(b). The trial judge noted, however, that he believed that Johnson's statements had been made voluntarily. At his separate trial, Johnson was acquitted of Intentional Murder but found guilty of Felony Murder. He was sentenced to life imprisonment.

Prior to trial, Barnett entered into plea negotiations with the State. Pursuant to these negotiations, Barnett gave a statement consistent with the ones given earlier by Johnson. The plea negotiations broke down, however, when the State only offered First Degree Murder with a life sentence. As a result of this impasse, Barnett attempted to fire his attorneys, claiming that they had misled him. The trial court rejected this effort but eventually ruled that Barnett's statement, as the product of these negotiations, was inadmissible for any purpose by either party, including at the penalty phase.

Although Johnson was called as a witness by the State at the joint trial of Barnett and Barrow, he refused to testify. Consequently, the State attempted to introduce into evidence Johnson's previous statements that had been suppressed. Counsel for both defendants objected to the introduction of these statements on the following grounds: (i) the statements were hearsay and did not qualify as an admission against penal interest and (ii) the statements were inherently unreliable because they were obtained in violation of 10 *Del. C.* § 1004(2) and Family Court Rule 5(b)(1)(b). The trial judge overruled this objection holding that Johnson's statements qualified as statements against penal interest and indicating that he would permit introduction of certain segments. After preserving their objection on the record, the defendants stipulated to the contents of Johnson's statements to be offered into evidence at trial. This stipulation reduced the contents of Johnson's statements to the following four points:

1) He was the lookout at the back steps of Black Sheep Sporting Goods Shop on June 25, 1995.

2) He assisted in carrying the bag of guns back to Lancaster Court Apartments, Apartment 2–C.

---

**3.** A "bomba cloth" is a derogatory Jamaican slang term.

**4.** 10 *Del. C.* § 1004 provides, in part, that when a juvenile is taken into custody, the peace officer shall immediately notify the child's parents or custodian of the juvenile's detention and the reasons for the detention. Family Court Criminal Rule 5(b) outlines the procedure for taking a child into custody, notifying the child's custodian and presenting a child to the magistrate "without unreasonable delay."

3) At Apartment 2–C he changed his clothes.

4) At Apartment 2–C he was taken into custody by Corporal Hale of the Delaware State Police while lying on the living room floor.

The jury was also instructed that the agreement between the parties "should not be constituted as an acceptance of the facts of the statement, but is merely an agreement as to its contents."

Neither Barnett nor Barrow testified at trial. Ultimately, the jury convicted both defendants of three counts of First Degree Murder (one count of Intentional Murder, and two separate Felony Murder counts) and related offenses. After the penalty phase, the jury determined that the aggravating circumstances outweighed the mitigating circumstances for both Barnett and Barrow and, by a count of eight to four, recommended the death penalty for each. On February 3, 1998, after independently weighing the aggravating and mitigating factors and considering the jury recommendation, the trial judge sentenced both defendants to death.

## II

We first address the various claims of error directed to the jury selection process. A claim advanced by both defendants concerns the *voir dire* questioning of prospective jurors. Separately, Barnett attacks the State's use of its peremptory challenges and complains that the jury selection process in this case empaneled a "death qualified" jury that did not reflect a fair cross section of the community. These claims, although somewhat intertwined, will be examined separately.

## A.

The defendants complain that the trial court's *voir dire* of prospective jurors was narrowly circumscribed through the use of standard questions without probing for individualized views. The United States Supreme Court has held that a juror must be excluded if that juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); (quoting *Adams v. Texas,* 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980)); *accord DeShields v. State,* Del.Supr., 534 A.2d 630, 634 (1987). To meet this standard in Delaware capital murder cases, the trial court seeks, through direct questioning of jurors, to determine whether, after a guilty verdict, those jurors would either impose the death penalty automatically or would refuse to impose the death penalty under any circumstances. This ensures that the jury will be comprised of individuals who are willing to recommend either death or life imprisonment, depending on the circumstances.

■ The *voir dire* questions asked by the trial court in this case were:

Do you believe that anyone who takes another persons's life automatically forfeits his right to live?

In the event the jury found either defendant guilty of First Degree Murder, would you automatically vote in favor of the death penalty regardless of the presence of any mitigating circumstances and regardless of the Court's instructions on the law?

The defendants argue that by limiting *voir dire* to two yes/no questions, the trial court rendered it impossible for them to make an informed choice concerning the possible pro-death penalty bias of individual jurors. This argument, however, must fail. In *Manley v. State,* Del.Supr., 709 A.2d 643, 655 (1998), this Court ruled that although open-ended questions may be preferable, they are "not required in order for the *voir dire* to be constitutionally adequate." Further, in this case prior to *voir dire,* the trial judge sought to allay the defendants' concerns and expressed a willingness to go beyond the two scripted questions if the need arose:

If I detect any hesitancy or any need, I can't quantify it any better, because if someone says, "I believe the death penalty is appropriate in certain situations," and leads to follow up, please be advised there will be an opportunity to do that. . . .

. * * * * * *

So, I guess the way that I'll do it is to play it, for lack of a better term, by ear and if you or any of the other attorneys, including the State, has a feeling for whatever reason that we ought to follow up, I'll do it in each and every case.[5]

Although the defendants argue that the scripted questions did not allow them insight into possible biases not revealed in a simple "yes" or "no" answer, the trial judge's willingness to explore these issues further in specific instances cured this concern. We conclude that this claim is controlled by our ruling in *Manley* and that the *voir dire* was "adequate for the trial judge to ascertain whether each prospective juror would be impartial . . . . [and] sufficient to enable [the defendants'] attorney[s] to evaluate each juror. . . ." *Id.* at 655.

### B.

Barnett argues that the record demonstrates that the State "used certain peremptory challenges to exclude minority jurors." Barnett contends that the State's explanations for its challenges were "weak at best, particularly when comparing the white jurors, with whom the State was 'content,' despite the fact that [those jurors] exhibited the same 'red flags' for which the black jurors were struck." Barnett contends that the trial court's determination that the State's challenges were race-neutral is not supported by the record and, therefore, clearly erroneous. The State counters that application of the principles set forth in *Batson v. Kentucky,* 476 U.S. 79, 96–98, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) and *Purkett v. Elem,* 514 U.S. 765, 767–68, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) demonstrates that the trial judge's factual finding that the State's peremptory challenges were not racially motivated is supported by the record.

In a *Batson* claim, the issue of "whether the prosecutor offered a race-neutral explanation for the use of peremptory challenges is reviewed *de novo*." *Dixon v. State,* Del.Supr., 673 A.2d 1220, 1223 (1996). Under *Batson,* once the opponent of a peremptory challenge makes out a *prima facie* case of racial discrimination, the burden shifts to the proponent of the strike to come forward with a race-neutral explanation. *See Purkett,* 514 U.S. at 767, 115 S.Ct. 1769. If such an explanation is tendered, the trial court must then decide whether the opponent of the strike has proved purposeful discrimination. *See id.* Once this Court is satisfied with the race-neutrality of the explanation, howev-

---

**5.** This approach is similar to the cautionary statement given by the trial court in *Manley:*

> This [jury *voir dire* ] is not a set script. I mean, I've discovered that some of the answers, you know, automatically, I think, common sense, lead to other questions that aren't even on here. Okay, and while I choose not to give such an open ended initial question as what are your views on the death penalty, I know—I mean we could go on . . . that issue. The statute directs the court to focus on whether they have any conscientious scruples against the imposition of the death penalty and, if they do, whether they can set those scruples aside and obey the rule of law.
>
> Now, I think that's the heart of the matter for which the court has to direct its ques-

> tions to the jury in this *voir dire,* but—I know in other cases I have gotten answers, well, I'm not sure. You know, you do open up the doors there. What do you mean you're not sure? Explain what you mean. And they might go into, well, my philosophical position is—and I'm not going to interrupt them and say, excuse me, just limit your answer, you know.
>
> And I'm not foreclosing that in this case in the sense that if it seems to follow that that question is a logical successor to the answer which has been given by the prospective juror, I'll certainly ask that questions and others like them.
>
> 709 A.2d at 654.

er, the trial court's finding with respect to discriminatory intent will stand unless it is clearly erroneous. *See Dixon*, 673 A.2d at 1224.

In this case, the court considered challenges based on *Batson* with respect to six potential African–American or Hispanic jurors to whom the State offered race-neutral explanations. These were as follows: (i) Ms. H [6]—the State expressed concern about her age and demeanor, her physical health and her ability to pay attention; (ii) Ms. J—the State noted that she was a "very soft-spoken, almost timid, woman," and might be easily influenced by "unreasonable defense arguments"; (iii) Mr. S— the State cited a number of arrests under another name and his failure to mention them; (iv) Ms. K—the State cited her *voir dire* comment that she felt uncomfortable sitting in judgment of someone else in death penalty case; (v) Ms. O—the State explained that she is a paralegal and that there was already a lawyer on the jury; the State further noted that her husband had been investigated for fraud, possibly arousing resentment against the State; and (vi) Mr. N—the State cited to his *voir dire* comment that he wanted to be 100 percent sure in terms of the death penalty and the fact that as a professional counselor, he might be too sympathetic to the defendants. The Superior Court, applying the standards of *Batson*, found that the State had not "given [it] any cause for concern. It's come close in a couple of cases . . . but not [to] where [the court] did not believe what the [State was] telling [it]."

The final panel was comprised of nine women and three men. Two African–American jurors and one African–American alternate were impaneled. Of the 40 potential jurors considered, the racial makeup was 28 Caucasian, 11 African–American and 1 Hispanic.

The explanations tendered by the State for the use of their peremptory strikes were, on their face, race-neutral. In *Dixon*, this Court, in finding that the trial court's determination was not clearly erroneous, considered the following factors: (i) the explanations were specific to the individual jurors and the State had struck a white juror for the same reasons; (ii) the ultimate composition of the jury—10 Caucasians, 2 African–Americans and 1 African–American alternate—while not dispositive, supported a race-neutral finding; and (iii) that the prosecutor used his strikes equally to exclude 3 African–Americans and 3 Caucasians. 673 A.2d at 1224.

■ Although this case presents a much closer *Batson* determination than *Dixon*, the Superior Court's decision finding that Barnett had not proved purposeful discrimination was not clearly erroneous. First, for each minority juror struck, the State offered racially neutral explanations which were neither implausible nor inherently discriminatory.[7] Second, the final composition of the jury, 10 Caucasians, 2 African–Americans and 1 African–American alternate, may support a race-neutral finding. Third, the State struck 6 out of 28 Caucasian jurors and struck 6 out of 12 minority jurors (5 African–Americans and 1 Hispanic), using its preemptories equally, if not proportionally. Given our clearly erroneous standard of review, we conclude that the trial court's rejection of the alleged *Batson* violations is sustainable. *See Dixon*, 673 A.2d at 1224.

## C.

■ Lastly, Barnett mounts a third, and related, attack upon the jury selection process that occurred at his trial. He argues

---

**6.** For purposes of this opinion, jurors will be identified only by letter.

**7.** In fact, the trial court, itself, agreed with the explanations proffered by the State in every case but that of Mr. N. In the case of Mr. N,

the trial court disagreed with the State's characterization of the juror's demeanor but still found the State's concerns to be genuine, although somewhat unconvincing.

that the 62 percent minority juror removal for cause in this case, under the standards of *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), is reflective of a national racial disparity in death qualified juries. Barnett contends that the death qualification process "systemically and disproportionately removes a cognizable racial group from serving as jurors" in violation of the "defendant's right to have a fair cross-section of the community available for jury selection." Specifically, Barnett claims that because statistics show that African–Americans favor the death penalty in smaller proportions than do Caucasians, requiring the jury be "death qualified" systematically and disproportionately excludes African–Americans from serving as jurors in death penalty cases.

The State counters that Barnett's claim must fail because the cross-section requirement does not apply to petit juries and, even if it did, the *Witherspoon* death qualification process advances the State's interest in securing jurors who can perform their duties in accordance with their oath. This factor, the State argues, outweighs any conceivable infringement of a defendant's right to a jury composed of a fair cross-section of the community.

We find no merit in Barnett's death qualification claim. There is no clear evidence that death qualification systematically and disproportionately removes a cognizable racial group from the petit jury. The mere recitation of national data will not suffice. Moreover, the United States Supreme Court has previously rejected the claim that allowing challenges for cause to jurors unalterably opposed to the death penalty violates the fair cross-section requirement. *See Holland v. Illinois,* 493 U.S. 474, 482–83, 110 S.Ct. 803, 107 L.Ed.2d 905 (1990).

This Court has recognized that, even under Delaware's current statutory scheme where the jury merely recommends a sentence, the death qualification of the jury remains an important part of the *voir dire* process. *See State v. Cohen,*

Del.Supr., 604 A.2d 846, 856 (1992). Permitting the impanelment of jurors who have no intention of weighing all possible penalties in capital murder cases would irreparably distort the process against the State's interest. The *Witherspoon* standard is, thus, conceptually justified and its application here not erroneous.

III

Barrow, alone, asserts two claims of error arising out of his detention by police. These claims will be examined separately.

A.

Barrow contends that he was detained by the police for approximately twelve hours preceding his formal arrest in violation of 11 *Del. C.* § 1902. Although Barrow was only asked to give his identity and business abroad and no evidence was seized from his person during the period of detention, he was photographed. These detention photos appeared in a local newspaper and led to an identification by Morris Cotton.

Section 1902(a) permits a police officer to "stop any person ... in a public place, who the officer has reasonable ground to suspect is committing, has committed or is about to commit a crime, and may demand the person's name, address, business abroad and destination." Grounds for such a stop exist when the officer can "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant th[e] intrusion." *Coleman v. State,* Del.Supr., 562 A.2d 1171, 1174 (1989), (quoting *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)); *see also Jones v. States,* Del.Supr., No. 115, 1998, 745 A.2d 856, 861, Veasey, C.J. (1999). Section 1902(c) provides that this period of detention cannot exceed two hours and that this detention is not an arrest. Following the two hour period, the

police must either release or arrest the detainee.

■ If the detainee is arrested, 11 *Del. C.* § 1904(b)(1) provides that the police officer must have "reasonable ground to believe that the person to be arrested has committed a felony . . . ." With respect to section 1904, this Court has interpreted "reasonable ground" to be the equivalent of "probable cause." *See Thomas v. State,* Del.Supr., 467 A.2d 954, 957 n. 3 (1983). This Court has further interpreted "probable cause" to be "facts which suggest, when those facts are viewed under the totality of the circumstances, that there is a fair probability that the defendant has committed a crime." *State v. Maxwell,* Del.Supr., 624 A.2d 926, 930 (1993). Where the police have properly detained and/or arrested the suspect, any evidence recovered as a result of such action is admissible at trial. However, if the detention was procedurally defective, all evidence derived therefrom is inadmissible, *see Wong Sun v. United States,* 371 U.S. 471, 484–85, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Schaffer v. State,* Del.Supr., 184 A.2d 689, 692 (1962), unless the State can prove that the evidence in dispute had a completely independent source. *See Jones,* 745 A.2d at 873, *Mason v. State,* Del.Supr., 534 A.2d 242, 251 (1987).

■ In this case, the trial court issued a lengthy pretrial opinion on both defendants' motions to suppress. The court thoroughly analyzed every element of Barrow's claim, finding sufficient reasonable suspicion for the initial detention under section 1902,[8] as well as sufficient probable cause to effect an arrest within two hours of the section 1902 detention.[9]

We, thus, find the trial court's analysis persuasive and free of legal error.

### B.

■ Barrow's remaining claim of error was not raised at trial and is, therefore, reviewable only under a plain error standard. *See Floray v. State,* Del.Supr., 720 A.2d 1132, 1137 (1998); Supr. Ct. R. 8. Plain errors are those "so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process." *Wainwright v. State,* Del.Supr., 504 A.2d 1096, 1100 (1986).

Barrow, who claims to be a citizen of Guyana, contends that he was denied access to his Consulate in violation of Article 36(1)(b) of the Vienna Convention on Consular Relations and Optional Protocol Disputes. He seeks to analogize this right to a denial of the right to counsel, a deprivation that "cannot be harmless."

Article 36 of the Vienna Convention on Consular Relations deals with the treatment of foreign nationals arrested in signatory nations. It requires authorities to inform the consul of the defendant's home country of the defendant's arrest, if the defendant so requests. Art. 36(1)(b). It also requires the authorities to notify a foreign national defendant of his or her rights under this Article. *Id.* In *dicta,* the United States Supreme Court recently intimated that the failure by arresting authorities to follow Article 36 could be deemed harmless error, depending on the circumstances. *Breard v. Greene,* 523 U.S. 371, 118 S.Ct. 1352, 140 L.Ed.2d 529 (1998) ("[I]t is extremely doubtful that the violation should result in the overturning of a final judgment of conviction without

---

8. The fact that Patricia Johnson initially stated that Barrow was not one of the men she saw exiting Black Sheep Sports did not negate the other evidence the police had, *i.e.,* his evasiveness and his matching the general description of the suspects that gave rise to their reasonable suspicion concerning Barrow at that time.

9. Barrow argues that his arrest did not occur until some twelve hours after his initial detention. As the trial court properly found, however, if the section 1902 detention continues beyond two hours and probable cause is present, the arrest has constructively taken place under a section 1904 analysis. *See generally United States v. Sharpe,* 470 U.S. 675, 684, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985).

some showing that the violation had an effect on the trial."). In a recent case touching on this issue, the First Circuit found that failure to notify consulate officials was, in fact, harmless where the defendant did not indicate how the consulate could have assisted in his defense or identify any material due process rights infringed by the failure to notify the consul. *United States v. Ademaj,* 1st Cir., 170 F.3d 58, 67–68 (1999), *cert. denied* —— U.S. ——, 120 S.Ct. 206, 145 L.Ed.2d 173 (1999).

■ Barrow's contentions under the Vienna Convention suffer from a lack of record support, a deficiency attributable to his failure to raise the issue at the trial level. Although the police testified that they determined from Barrow's identification that he was born in Guyana, Barrow offers no evidence to support a finding that he was, at the time of his arrest, a national of Guyana to whom Article 36 applies. Moreover, even if Article 36 applies to Barrow, he has failed to identify the specific due process rights denied to him by the police officers' alleged failure to inform him of his Article 36 entitlement and has failed to explain how the Guyana Consulate could have assisted his defense in any way. Lastly, Barrow confuses the right to inform the foreign *consul* with the guaranteed right to *counsel.* His analogy to the right to counsel under a plain error analysis is not persuasive.

## IV

As previously noted, Johnson was tried separately and in advance of the joint trial of Barnett and Barrow. Although called as a witness for the State, Johnson refused to testify despite being found in contempt by the trial court. When the State at-

tempted to present Johnson's out-of-court statements, previously ruled inadmissible at his own trial, counsel for the defendants objected on various grounds, the most important of which for present purposes being a violation of the right of confrontation. Although counsel for the defendants agreed to the introduction of a summary of Johnson's statements in redacted form after the trial court overruled their objections, the defendants argue that their objection to the substance of the statement is deemed to be preserved for appeal purposes.

### A.

When these cases were jointly argued before this Court *en banc* on May 25, 1999, it was determined that the Confrontation Clause issue might be affected by the outcome of a case then pending decision before the Supreme Court of the United States on appeal from the Virginia Supreme Court. *Lilly v. Virginia, cert. granted* 525 U.S. 981, 119 S.Ct. 443, 142 L.Ed.2d 398 (1998). Consequently, this Court stayed all further proceedings in this appeal pending the decision of the United States Supreme Court. After the issuance of that ruling, *Lilly,* 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117,[10] the defendants were directed to file supplemental briefs directed to the question of whether the admission of the stipulation reflecting Johnson's redacted statement was plain error with respect to either the guilt phase or the penalty phase of their trial

Although the supplemental briefing proceeded on the premise that the admissibility of Johnson's statement would be viewed under a plain error standard by reason of

---

10. *Lilly* did not produce a majority opinion. The plurality, however, found that evidence admitted pursuant to a hearsay exception is consistent with the Confrontation Clause if, "in light of longstanding judicial and legislative experience, it rests on such a solid foundation that admission of virtually any evidence within it comports with the substance

of the constitutional protection." 527 U.S. 116, 119 S.Ct. at 1895, 144 L.Ed.2d 117 (citations and quotations omitted). *Lilly* further held that not all accomplice statements against interest are inadmissible, rather, only the sort of blame-shifting statements at issue in that case. *Id.* at 1890–91.

the actions of defense counsel in agreeing to the stipulation reflecting Johnson's statement, we note that the stipulation was entered into only after the trial court had overruled the defendants' objection on confrontation grounds. In any event, in light of the decision of the Supreme Court in *Lilly*, we consider the confrontation claim as one of constitutional dimension and subject to plenary review. *See Smith v. State*, Del.Supr., 647 A.2d 1083, 1088 (1994).

Preliminarily, the State contends that Barnett and Barrow have no standing to object to the admissibility of Johnson's statements at trial because only Johnson's rights were implicated when the police took his statement without parental notification in violation of 10 *Del. C.* § 1004 and Family Court Criminal Rule 5(b). The State also argues that the trial judge was correct when he determined that Johnson's statements to the police were inadmissible at Johnson's trial but were both voluntary and reliable enough to be admissible against the defendants as a statement against penal interest under D.R.E. 804(b)(3).[11]

 To a point, the State is correct in asserting that the defendants lack standing to challenge the violation of Johnson's rights. *See Righter v. State*, Del.Supr., 704 A.2d 262, 267 (1997) (holding that defendant lacked standing to challenge alleged violation of knock and announce rule); *Alderman v. United States*, 394 U.S. 165, 171–72, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969) ("[S]uppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence. Co-conspirators and codefendants have been

afforded no special standing."). The State, however, ignores the fact that the defendants have standing to challenge constitutional violations personal to them. Because the Johnson statement was offered by the State to prove their guilt, the defendants certainly had standing to object to the statement under the Confrontation Clause.

 As *Lilly* indicates, the mere qualification of an accomplice's statement as a statement against penal interest does not justify the use of that statement against another person, even when accompanied by redactions and limiting jury instructions. 527 U.S. 116, 119 S.Ct. at 1896, 144 L.Ed.2d 117. *Lilly* held that an accomplice's statement that inculpates a criminal defendant does not fall within a firmly rooted exception to the hearsay rule. *Id.* at 1899. Therefore, a court must find other "particularized guarantees of trustworthiness" that make an accomplice's statement admissible under the Confrontation Clause. *Id.* at 1990; *see also Ohio v. Roberts*, 448 U.S. 56, 57, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980) (hearsay statements are admissible notwithstanding the Confrontation Clause if the declarant is unavailable to testify and the statement "bears adequate indicia of reliability"); *Smith*, 647 A.2d at 1088 ("absent some special indicia of reliability and trustworthiness, hearsay statements are inadmissible").

*Lilly's* emphasis on reliability and guarantees of trustworthiness is consistent with this Court's prior construction of D.R.E. 804(b)(3). Adopting the reasoning expressed in *Williamson v. United States*, 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994), this Court held in *Smith* that

---

11. D.R.E. 804(b)(3), the hearsay exception for a statement against interest, provides:
 A statement which was, at the time of its making, so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in

his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

D.R.E. 804(b)(3) "only allows admission of truly self-inculpatory statements." 647 A.2d at 1086. This Court further stated, "[t]here is no clear policy basis, however, for attributing equal guarantees of trustworthiness to declarations appurtenant to the self-incriminating ones, particularly those that are self-serving." *Id.* at 1087. For purposes of the Rule, we may not assume that "a statement is self-inculpatory because it is part of a fuller confession, and this is especially true when the statement implicates someone else." *Id.* (citing *Williamson*, 512 U.S. at 600–01, 114 S.Ct. 2431). Finally, this Court held that "[n]on-self-incriminatory components of a declaration purportedly falling within D.R.E. 804(b)(3) are presumptively inadmissible hearsay because they cannot claim any special guarantees of reliability and trustworthiness." *Smith*, 647 A.2d at 1088.

■ We conclude that the Superior Court abused its discretion in permitting Johnson's redacted statement to be admitted pursuant to D.R.E. 804(b)(3) in the joint trial of Barnett and Barrow because the statement was not truly self-inculpatory. If, as the State contends, Johnson's statement was truly self-inculpatory, one might inquire why the State sought to admit that evidence during the trial of Barnett and Barrow, who were not tried jointly with him? The obvious and unacceptable answer is because the statements implicate the defendants and were necessary to place both of them inside the gun shop at the time of the killing. Specifically, the statement that Johnson was the lookout, although self-inculpatory, assigns higher criminal culpability to Barnett and Barrow and constitutes accomplice finger-pointing.[12]

■ Moreover, even if Johnson's statements were properly admitted pursu-

ant to D.R.E. 804(b)(3), their admission violated the defendants' confrontation rights, as recently construed by the United States Supreme Court in *Lilly*. In order to pass constitutional muster, Johnson's statement had to meet the residual trustworthiness test, *i.e.*, it had to contain particularized guarantees of trustworthiness "such that adversarial testing would be expected to add little, if anything, to the statements' reliability." *Lilly*, 527 U.S. 116, 119 S.Ct. at 1894, 144 L.Ed.2d 117, *accord Demby v. State*, Del.Supr., 695 A.2d 1152, 1162 (1997). The indicia of reliability required by *Lilly*, however, are clearly lacking in the present case. Johnson was a minor at the time he gave the police his statements; he had been in police custody for twenty-five hours when he made his statements; his statements minimized his role in the homicide; there was no contemporaneous cross-examination of Johnson at the time he gave his statement; and his parents were not timely notified that he was in custody as required by 10 *Del. C.* § 1004. Further, Johnson's statements were suppressed during his own trial pursuant to *Palmer v. State*, Del.Supr., 626 A.2d 1358 (1993) and 10 *Del. C.* § 933.

At Barnett and Barrow's trial, the court in considering the effect of the Johnson suppression ruling indicated the belief that *Palmer* provided no support for the defense argument that statements taken in contravention of the statute must be deemed unreliable. *Palmer*, however, clearly states that failure to comply with 10 *Del. C.* § 933 deprives the juvenile of "significant rights" which are "grounded, in part, on a juvenile's due process and self-incrimination rights." 626 A.2d at 1363. Logically, a statement taken in violation of the declarant's due process rights, however used, raises a serious question as to its reliability.

---

12. A statement that Johnson participated in the robbery, without stating his role, would have been truly self-inculpatory. Similarly, the portion of the stipulated statement that Johnson "assisted in carrying the bag of guns" does not so clearly implicate either Barnett or Barrow as to constitute finger-pointing in the same sense as does the lookout statement.

In light of *Lilly's* standard of admissibility, we conclude that Johnson's statement was not inherently reliable and that the trial court erred by admitting it against the defendants without the opportunity for cross-examination. A finding of clear error in this case would be "consistent with Delaware's traditional approach of viewing constitutional protection of confrontation accorded the accused by the United States Constitution as a floor rather than a ceiling." *Smith,* 647 A.2d at 1088.

### B.

 The inquiry, however, does not end here. *Lilly* leaves to the state courts the determination of whether a Sixth Amendment error in admitting evidence was "harmless beyond a reasonable doubt." 527 U.S. 116, 119 S.Ct. at 1901, 144 L.Ed.2d 117 (quoting *Chapman v. Calif.,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)); *see also Van Arsdall v. State,* Del.Supr., 524 A.2d 3, 11 (1987) (adopting the *Chapman* standard and holding that reversal is required whenever a reviewing court could not find that the error was harmless beyond a reasonable doubt). "Ultimately, the Court must weigh the significance of the error against the strength of the untainted evidence of guilt to determine whether the error may have affected the judgment." *Van Arsdall,* 524 A.2d at 11.

In our view, the damaging effect of Johnson's statement was limited to the guilt phase of the trial in light of the strength of the State's evidence of the general participation of Barnett and Barrow in the criminal enterprise leading to Smith's death. We find the stipulation to have been particularly prejudicial, however, in the penalty phase where the State drew a comparison between Johnson and the defendants in seeking the death penalty.[13]

The theory of the State's case, as illustrated by the need to introduce Johnson's statement, was that Johnson was the lookout and the defendants went inside the shop, with Barrow as the triggerman based on his incriminating post-shooting statement. The defendants argue, however, that the evidence is inconsistent with this theory because Johnson's fingerprints were discovered on the murder weapon and the police recovered the victim's keys to the gun cabinet and part of a pen owned by the victim in the yellow pants described by several witnesses as being worn by Johnson. Additionally, no witness ever identified either Barnett or Barrow as the two who went inside the store. Two witnesses behind the gun shop did give the police a description of a man resembling Johnson standing outside the store while the other two men went inside, but the accuracy of those observations was called into question on cross-examination. The defendants argue that the stipulation unfairly bolstered the testimony of these two witnesses and afforded more credibility to the description of Johnson as the lookout. Additionally, the defendants contend that the prosecutor, in arguing that the homicide was preplanned, remarked that "Barnett and Barrow enlisted and used a juvenile to serve as the lookout in their plan." The State maintains that the admission of Johnson's statement via the stipulation was not clear error and that, in any event, it presented sufficient evidence apart from Johnson's statement to support the guilty verdicts as to all charges.

 The record contains sufficient untainted evidence to support a guilty verdict as to the participation of Barnett and Barrow in the robbery of the gun shop. Two witnesses reported that three black males wearing baseball caps approached the shop in a suspicious manner. One of these two witnesses told the 911 operator that the

13. The prosecutor, in advocating the death sentence, told the jury that Barnett was more culpable than Johnson, and that "[i]f Lawrence Johnson got a life sentence for being a

lookout . . . is that what these two should get? No. Their involvement was much greater than Lawrence Johnson's."

lookout had a light complexion and wore mustard colored pants. During the investigation of the crime, the police found yellow pants, consistent with the witness' description, on the floor near Johnson where he was pretending to sleep in a friend's apartment. When the police returned to the apartment with a search warrant early the next morning, they found guns and ammunition stolen from the victim's gun shop, as well as a gun later determined to be the murder weapon. Although only Johnson's prints were on the gun, the police also recovered two pairs of gloves similar in description to those worn by the two men who entered the store containing gunshot residue. Thomas testified at trial that he overheard Barnett, Barrow and Johnson discussing a plan to rob the store, that Barrow came in carrying a heavy bag full of guns and that the three men celebrated their success with "high fives." Thomas also testified that he heard Barrow say "I shot the bomba cloth." Lastly, all three men hurriedly changed clothes when they heard police helicopters overhead.

Even without Johnson's statement, a reasonable jury could find beyond a reasonable doubt that Barnett and Barrow planned with a third individual, presumably Johnson, to rob the gun shop and that a killing resulted from that robbery. It would, thus, appear that the State presented sufficient evidence beyond a reasonable doubt to support a conviction of both defendants as to both charges of felony murder pursuant to 11 *Del. C.* § 636(a)(2) and (6). As to that verdict, which may subsist simply on a finding that each defendant played a major role in the underlying felony of robbery with reckless disregard for human life, the respective roles of the three perpetrators sought to be particularized through Johnson's statement is irrelevant.

### C.

The more difficult question posed by the admission of Johnson's statement is whether the record, apart from that statement, supports a guilty verdict as to the separately determined charge of intentional murder under 11 *Del. C.* § 636(a)(1) and, relatedly, the extent to which the admission of Johnson's statement compromised the jury's findings in the penalty phase of the trial. Delaware law authorizes the imposition of the death sentence for seven categories of murder in the first degree. *See* 11 *Del. C.* § 636. Both Barnett and Barrow were charged with three categories of Murder First Degree: Felony Murder under section 636(a)(2); Felony Murder under section 636(a)(6); and Intentional Murder under section 636(a)(1). The principal distinction between these charges, for present purposes, is the requisite state of mind. Felony Murder is satisfied through proof of reckless or negligent causation while intentional murder requires proof of consciously engaging in conduct resulting in death. *See* 11 *Del. C.* § 231(a)(1).

We view the use of Johnson's statement as particularly important to the State's effort to prove an intentional killing by the defendants. Although the only direct evidence identifying the actual shooter was Thomas' testimony implicating Barrow, Johnson's fingerprints also appeared on the murder weapon. Because the victim was killed by a single shot, only one of the three charged individuals could have fired the weapon. The State, through Johnson's statement, argued to the jury that the shooting could not have been done by the "lookout:"

> Pat [Johnson] told the 911 operator . . . that there were three black males, the lookout was wearing mustard colored pants, . . . the lookout with a skin complexion so light that Pat wasn't even sure he was a black male; the same lookout, whose statement, "I was the lookout at the Black Sheep Sporting Store" is in evidence before you. (5/31/97 Tr. pp. 79–80)

Johnson, of course, had already been acquitted of Intentional Murder and while he

provided no testimony supporting the intentional acts of either of the other co-defendants, his redacted statement provided a necessary link to establish the alternative charge of Intentional Murder.

It is difficult to quantify the effect of the Intentional Murder verdict on the jury's ultimate recommendation, by votes of eight to four, of the death penalty for each defendant. The trial judge's findings supporting his imposition of the death penalty interpreted the jury's vote as an indication the defendants were "equally culpable." The trial judge also found no basis to differentiate between the defendants' mental state because each had participated in conduct evidencing "reckless indifference to human life." The real significance of the eight to four vote, however, is that it followed a jury determination that the defendants were guilty of Intentional Murder as well as Felony Murder. Because neither defendant testified during the guilt phase, the jury's vote strongly suggests that the jury made no distinction between their respective roles and accepted the State's theory that, unlike Johnson, Barrow and Barnett were equally guilty of Intentional Murder.

■ Unlike our view of the evidence supporting the Felony Murder conviction, we cannot say with confidence that the admission of Johnson's statement did not provide an essential link in the State's effort to establish guilt of Intentional Murder as to both defendants. Accordingly, we cannot find the admission of that evidence harmless beyond a reasonable doubt as to the convictions of Intentional Murder and those convictions must be reversed. The State, if it elects, is free to retry the defendants on the Intentional Murder charges without the use of Johnson's statement in the event that it does not opt to proceed solely with a new penalty hearing, as hereafter required, on the Felony Murder convictions.

### D.

In *Enmund v. Florida*, 458 U.S. 782, 797, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), the United States Supreme Court held that a violation of the Eighth and Fourteenth Amendments occurs when the death penalty is imposed on a person who aided and abetted a felony in the course of which a murder was committed by others but who did not kill, intend to kill or believe that life would be taken. The Court later refined the *Enmund* standard in *Tison v. Arizona*, 481 U.S. 137, 157–58, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987), holding that the death penalty is not disproportionate under the Eighth Amendment when a defendant's participation in a murder was substantial and that defendant's mental state evidenced "reckless indifference" to human life.

■ Applying the *Enmund/Tison* analysis to the present case, it is clear that the admission of Johnson's statement via the stipulation impacted the defendants' rights during the penalty phase. *See Dawson v. Delaware*, 503 U.S. 159, 165, 112 S.Ct. 1093, 117 L.Ed.2d 309 (1992). The admission of the Johnson stipulation unfairly removed Johnson as a participant in the homicide and thereby compromised the defense by narrowing the field of those who fired the shot. Other than Thomas' statement to police that Barrow said that he "shot the bomba cloth," the record is devoid of any eyewitness account or other direct evidence that would identify who pulled the trigger or indicate that the murder, as distinct from the robbery, was planned. *See State v. Rodriguez*, Del. Supr., 656 A.2d 262, 271 (1993) ("*Enmund* and *Tison* are not satisfied in the usual multiple defendant murder case where there are no eyewitnesses and where the evidence is circumstantial and does not clearly identify the actual killer").

Other testimony offered at trial does not prove beyond a reasonable doubt who fired the shot or that the homicide was planned. The State tried to prove that the homicide was planned by arguing at trial that the stipulation showed that the defendants

"enlisted and used a juvenile in their plan." The State's argument, however, is conjecture. Thomas testified that he also visited the gun store with Barrow and another individual the day before the robbery and murder to purchase ammunition. Thomas further testified that he had heard Barrow, Barnett and Johnson discussing plans for the robbery. Thomas did not offer any testimony that the robbery plans included murder. Consequently, there is little direct proof as to who fired the shot or that the homicide was planned. Although Johnson's fingerprints were found on the murder weapon, the stipulation effectively eliminates him as the shooter. Accordingly, we conclude that the admission of the stipulation was clearly prejudicial to the defendants at the penalty phase of the trial at issue. *See Dawson,* 503 U.S. at 165, 112 S.Ct. 1093.

### E.

Apart from the prejudicial effect of the Johnson statement, Barnett's penalty hearing is tainted by an additional error. Barnett contends that his Eighth and Fourteenth Amendment rights were violated when the Superior Court precluded him from presenting mitigation evidence during the penalty phase regarding his cooperation with the police. He argues that the Superior Court erred in its ruling that his statement made in contemplation of a plea agreement was inadmissible at trial based upon D.R.E. 410 and Superior Court Criminal Rule 11(e)(6). Barnett claims that evidence of his "truthful cooperation with the police would have been critical to the jury's decision making process, and ultimately to his life." He further claims that whether he hoped to gain some advantage in confessing should go to the "weight of the evidence as a mitigating factor." Finally, Barnett notes that federal courts have ruled that the comparable federal rule does not apply to sentencing hearings,

and the trial court's decision to exclude his confession at the penalty phase was error.

The Superior Court first orally, and then in writing, ruled that Barnett's statement was "inadmissible in any form or for any reason at the trial of this case." In its written decision, the court held that the statement fell within D.R.E. 410.

D.R.E. 410 provides:

Except as otherwise provided in this rule, evidence of a plea of guilty later withdrawn with court permission, or a plea of nolo contendere, or of an offer to plead guilty or nolo contendere to the crime charged or any other crime, or of statements made in connection with, and relevant to, any of the foregoing pleas or offers, is not admissible in any civil or criminal proceeding *against the person who made the plea or offer . . .*

(Emphasis supplied).[14]

The State, although initially supportive of the trial court's interpretation of D.R.E. 410, now concedes that the Rule precludes admission of a plea offer "against the person who made the plea or offer." The State, nevertheless, contends that the statement was both hearsay and wholly irrelevant to the mitigating factor Barnett wanted to establish—assistance to and cooperation with the police—because the statement was given in expectation of a plea agreement and once the plea negotiations broke down the statement was of no use to the police aside from the possible situation where Barnett testified inconsistently with it.

█ The Superior Court's ruling that Barnett's statement as evidence of cooperation was inadmissible at the penalty phase was erroneous. D.R.E. 410 clearly contemplates that it applies *against* the interests of the person who made the plea or offer. The State is incorrect that Barnett's statement would be hearsay because the statement was not being offered for the truth of its content but to evidence

---

**14.** Superior Court Criminal Rule 11(e)(6) similarly provides that statements related to plea discussions are not admissible *against the defendant who made the plea.*

Barnett's cooperation with the police. Additionally, there is support for Barnett's position that the Rule's application should not extend to sentencing proceedings. *United States v. Upton,* 5th Cir., 91 F.3d 677, 688 (1996); *United States v. Medina–Estrada,* 10th Cir., 81 F.3d 981, 986 (1996).

■■■■ The United States Supreme Court has stated that the "mere declaration that evidence is 'legally irrelevant' cannot bar the consideration of that evidence if the sentencer could reasonably find that it warrants a sentence less than death." *McKoy v. North Carolina,* 494 U.S. 433, 441, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990). Moreover, "[a] State may not cut off in an absolute manner the presentation of mitigating evidence, either by statute or judicial instruction, or by limiting the inquiries to which it is relevant so severely that the evidence could never be part of the sentencing decision at all." *Id.* at 456, 110 S.Ct. 1227. Here, Barnett's cooperation with the police may have led either the jury, whose decision is given great weight, or the court, as the ultimate sentencer, to reasonably find that a sentence less than death was warranted. Although the mitigating effect of this evidence cannot be determined with certainty, it was clearly relevant to the task of weighing all factors touching upon the mitigation of the offense or the person.

### F.

Our determination of error in the exclusion of Barnett's offer of cooperation complicates the process of affording both defendants the new penalty hearing mandated by our rulings concerning the use of Johnson's statements and the striking of the intentional murder convictions. Permitting Barnett to offer his statement to the police as evidence of cooperation in a new joint penalty hearing would implicate the same *Lilly* concerns as did Johnson's statement. Indeed, the effect on Barrow would be even more damaging since while Barnett admits his role in the robbery, his statement identified Barrow as the shooter.

Even redaction of Barnett's statement would not overcome the confrontation problem because, unlike Johnson's statement, Barnett's statement places only himself and Barrow inside the shop at the time of the shooting. Because only the making of a cooperative statement leading to plea negotiations (not the contents of the cooperative statement) is relevant mitigation as to Barnett, however, some form of stipulation might be acceptable. Another alternative might be the use of two separate juries who would hear all the common evidence, while only one jury would hear the mitigation evidence offered by Barnett that might implicate Barrow. A separate penalty hearing might also be feasible.

Although we note the problems implicated in a new penalty hearing, we do not dictate a particular solution. We leave to the trial judge the admittedly difficult task of fashioning proceedings to permit the State to pursue a death penalty determination consistent with the constitutional rights of both defendants.

### V

■■■■ The imposition of the death penalty requires scrupulous adherence to the constitutional standards that authorize its use. One of the most important of these standards is that there be "a nexus between the punishment imposed and the defendant's blameworthiness." *Thompson v. Oklahoma,* 487 U.S. 815, 853, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988) (O'Connor, J., concurring in the judgment). This requirement springs from the recognition that execution is "unique in its severity and irrevocability." *Gregg v. Georgia,* 428 U.S. 153, 187, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).

■■■■ As this Court has noted, "because culpability varies among defendants, the harshest punishment must be reserved for the most blameworthy." *Sanders v. State,*

Del.Supr., 585 A.2d 117, 141 (1990). These considerations are particularly apt where, as here, the jury, one-third of whom voted against the death penalty, and the sentencing judge are faced with the formidable task of individualizing punishment between defendants who are tried together for offenses arising from a single criminal enterprise. Once a defendant is adjudged guilty of capital murder, the decision to impose the death sentence must be based on "the totality of evidence in aggravation and mitigation which bears upon the particular circumstances or details of the offense and the character and propensities of the offender." *Pennell v. State*, Del.Supr., 604 A.2d 1368, 1375 (1992).

## VI

In summary, based on our careful examination of the record, the analysis of the difficult legal issues posed in this appeal and the recent holding by the United States Supreme Court in *Lilly*, we conclude that the admission of Johnson's redacted statement violated the confrontation rights of both defendants. This violation was harmless with respect to the Felony Murder convictions as well as the underlying felonies. The violation, however, was not harmless beyond a reasonable doubt as to the convictions of Intentional Murder. Accordingly, those convictions are reversed and remanded for a new trial, at the State's option, prior to the new penalty hearings.

Because the Felony Murder convictions are clearly supportable by the weight of separate and independent evidence, we find the Johnson statement not to have undermined the validity of those convictions which, in themselves, may provide the predicate for consideration of the death penalty under the procedure set forth in 11 *Del. C.* § 4209. We conclude,

however, that the admission of Johnson's statement in violation of the defendants' confrontation rights seriously compromised the jury's duty to weigh the mitigating and aggravating circumstances and precluded the imposition of a death penalty based on individualized guilt. In view of the fact that only eight of twelve jurors voted for the death penalty in this case, we cannot say with confidence that such error was harmless.[15]

As noted, we also find separate error in the penalty phase as to the exclusion of mitigating evidence with respect to Barnett. This finding requires the imposition of a new penalty hearing that will accommodate the constitutional rights of both defendants.

Finally, we find no merit to any claims of error directed to the jury selection or any other rulings asserted by either defendant during the guilt phase. Our ruling directing a new penalty hearing renders moot the defendants' proportionality claims.

---

**15.** In *Deputy v. State*, Del.Supr., 500 A.2d 581 (1985), this Court upheld the imposition of the death penalty for felony murder while reversing two intentional murder convictions. *Deputy* was decided under the former Dela-

ware death penalty statute requiring a unanimous jury verdict. Moreover, *Deputy* did not involve multiple defendants where, as here, evidence of blame shifting is critical.